[Civ. No. 11288. Third Dist. Mar. 30, 1967.]

EDWARD LOVE, as Special Administrator, etc., Plaintiff and Respondent, v. JOHN WOLF et al., Defendants and Appellants.

Rust & Hoffman, Robert Hoffman, Pillsbury, Madison & Sutro, Noel J. Dyer, Noble K. Gregory, Walter R. Allan and Glenn D. Newton for Defendants and Appellants.

Boccardo, Blum, Lull, Niland, Teerlink & Bell and Edward J. Niland for Plaintiff and Respondent.

BRAY, J.[†] — Defendant Wolf appeals from an order granting plaintiff a new trial and defendant Parke-Davis and Company appeals from the judgment in favor of plaintiff in the sum of $180,000 and from the order granting plaintiff a new trial on the issue of damages only.[1]

## QUESTIONS PRESENTED

A. Wolf appeal from order granting new trial.

1. Alleged abuse of discretion in granting new trial.

B. Defendant Parke-Davis appeal from judgment.

1. Alleged errors in admission of evidence.

(a) Later warning label.

(b) Dr. Wolf's testimony concerning the warnings.

2. Refusal to give a certain instruction.

3. Alleged misconduct of judge.

4. Were the verdicts inconsistent?

C. Defendant Parke-Davis appeal from order granting new trial on damages alone.

1. Effect of section 573 of the Probate Code.

2. Plaintiff's waiver of right to limited new trial.

D. The partial satisfaction of judgment.

## RECORD

Plaintiff Carney L. Love (Mrs. Love) filed this action against defendant John Wolf, a medical doctor, and defendant Parke-Davis and Company (Parke-Davis), a pharmaceutical company, for damages alleged to have been sustained by plaintiff when she developed aplastic anemia following the

[†]Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1]Subsequent to the filing of the appeals, Carney L. Love died and Edward Love, as special administrator of her estate, was substituted as plaintiff. However, throughout this opinion, unless otherwise appears, "plaintiff" will refer to Carney L. Love.

administration of an antibiotic, chloromycetin, prescribed by Dr. Wolf and manufactured by Parke-Davis. At a first trial plaintiff recovered judgment against both defendants for $334,046. This judgment was reversed on appeal because of misconduct of plaintiff's trial attorney. (*Love* v. *Wolf* (1964) 226 Cal.App.2d 378 [38 Cal.Rptr. 183].) At the second trial, the subject of this appeal, plaintiff recovered a judgment of $180,000 against Parke-Davis. Dr. Wolf obtained a defense verdict. On plaintiff's motion the trial court ordered a new trial as to Dr. Wolf and a new trial as to Parke-Davis on the issue of damages only. Each defendant separately appealed.

Chloromycetin is the trade name for CHLORAMPHENICOL. It is a "broad spectrum" antibiotic drug, meaning that it is an agent effective to kill or stop the growth of a wide variety of disease-causing organisms in human beings. This drug was developed and is exclusively manufactured by Parke-Davis. It may be administered only by doctors or on their prescriptions.

In 1952, three years after the introduction of the drug, instances had been reported of association of aplastic anemia with its use. Aplastic anemia is one of a number of "blood dyscrasias" (ill condition of the blood). The Food and Drug Administration caused an investigation to be made of the drug and its association with aplastic anemia. Thereafter the Food and Drug Administration decided that it had "weighed the value of the drug against its capabilities for causing harm and has decided that it should continue to be available for careful use by the medical profession in those serious and sometimes fatal diseases in which its use is necessary."

The drug is required to be manufactured in accordance with standards prescribed by the administration and before the drug can be distributed it must be tested by it and certified as having such characteristics of strength, quality and purity to insure safety and efficacy of use as are prescribed in the regulation. A specified cautionary warning for circulars or packages and labels is prescribed by the administration. The required language of these is set forth in *Love* v. *Wolf, supra,* page 383. Parke-Davis complied with this directive. It is conceded that the drug used in this case was pure and uncontaminated.

Aplastic anemia is very rare, about 1,000 fatal cases from that cause being noted in this country yearly. In 1952 Parke-Davis sent letters to 200,000 physicians advising them "of the association between chloromycetin and aplastic anemia (also

other blood dyscrasias) stating the number of cases was unknown 'but it recognized that many have terminated fatally.' It particularly warned of dangers from 'intermittent therapy for minor infections.' It pointed to indications of a 'calculated risk involved in the use of this potent antibiotic so that alert clinical observations and adequate blood studies should be made to detect any depression of bone marrow function as early as possible, and before any irreversible state occurs.' This was followed by another similar letter on August 12, 1952. The first letter promised: 'as information accumulates from continuing studies on the relation of blood disorders to chloromycetin it will be disseminated promptly through appropriate channels.'

"These letters were intended to reach all doctors and pharmacists in the United States. They were supplemented by full-page announcements in the American Medical Association Journal. Advertisements and promotional material distributed by the company since 1952 have contained a condensed warning similar to that on the packages and the labels." (226 Cal.App.2d, pp. 383-384.)

In August 1958 plaintiff had several teeth extracted. An infection or inflammation developed in one of the sockets. She consulted Dr. Wolf who had previously treated her for another ailment. He prescribed chloromycetin. The prescription was refilled. On November 4, 1958, plaintiff consulted Dr. Wolf for bronchitis. He again prescribed chloromycetin. The prescription was refilled several times. Altogether 96 capsules of 250 milligrams each were dispensed to plaintiff. The pharmacist who sold the drug to plaintiff was joined in this action as a defendant. At the first trial the jury's verdict was in his favor and was not appealed. Dr. Wolf last saw plaintiff professionally in December 1958. In the spring of 1959 aplastic anemia was diagnosed. She had been under treatment for aplastic anemia until the time of her death, subsequent to the rendition of judgment herein.

In its appeal from the judgment of liability Parke-Davis does not claim insufficiency of the evidence to support the judgment. It therefore becomes unnecessary to discuss the evidence in detail. While the evidence at the second trial was not precisely the same as at the first trial, it was sufficiently similar that the recital of the first trial evidence in *Love* v. *Wolf, supra,* 226 Cal.App.2d 378, gives an excellent idea of the evidence adduced at the second trial justifying a finding by the jury of overprescription by Dr. Wolf proximately caused by overpromotion of the drug by Parke-Davis.

A. *Dr. Wolf Appeal.*

1. No abuse of discretion in granting new trial.

■ In his opening brief defendant Wolf (citing *Arroyo* v. *Arden Farms Co.* (1966) 239 Cal.App.2d 332, 334 [48 Cal. Rptr. 74], and *Brown* v. *Reliable Iron Foundry, Inc.* (1959) 174 Cal.App.2d 294, 298 [344 P.2d 633]) concedes that in order to obtain a reversal of the order granting new trial, which was on the sole ground of insufficiency of the evidence to support the verdict, the general rule is that he must show that there is no substantial evidence which would support a judgment against him and in favor of plaintiff.

He also concedes that there is sufficient evidence in the record to have supported a verdict in favor of plaintiff if the trier of fact chose to believe that Dr. Wolf's action in 1958 of prescribing chloromycetin to plaintiff for her gum condition and bronchitis was not good medical practice or that Dr. Wolf authorized the refills of his two prescriptions.

He contends that from the very inception of the case the trial court was strongly biased in plaintiff's favor and that such bias was the motivating and controlling factor in the trial court's decision to grant the new trial rather than the stated ground of insufficiency of the evidence.

■ Dr. Wolf's concession that there was sufficient evidence to have supported a verdict against him is a concession that the court could have properly granted a new trial on the ground of insufficiency of the evidence had the court given due consideration to the matter and passed upon the motion for new trial free from alleged partiality, sympathy or prejudice.

Therefore, we need not set out in detail the evidence concerning Dr. Wolf's liability. It, like the evidence concerning Parke-Davis' liability, is similar to that at the first trial which is set out in detail in *Love* v. *Wolf, supra.* Our task, then, is to determine whether the trial judge's order was not based upon a consideration of the evidence but on the ulterior motives ascribed to him.

On the hearing of the motion for new trial the judge stated that on a motion for new trial "the trial judge has the right and power to pass upon the evidence again, to weigh it, to ascertain if in his opinion, after a study from the evidence, and inferences that might be drawn from it . . . whether a new trial should be granted." He then quoted the dissenting opinion in *McCordic* v. *Crawford* (1943) 23 Cal.2d 1, 9 [142 P.2d 7], a part of which quotation is that "the interests of

justice may require an independent reweighing of the evidence by the trial judge, after rendition of the verdict by the jury, . . .''

The judge continued with his statement: ''In this case I feel that the evidence introduced was substantially similar to the evidence introduced at the first trial. Now, I am going to refer to the case of *Love* versus *Wolf,* 226 ACA 482, and I am going to refer in that opinion to this quotation, or to this comment of the judge, which I quote: 'Substantial evidence supported the verdict and judgment against the doctor (had the case been fairly presented). A new trial will be necessary against him.' And again at page 496 the court said: 'The case was not open and shut in any aspect. As to the liability of Dr. Wolf, evidence of great weight supported plaintiff's contention,' and so forth, which the appellate court found there was evidence of great weight, or evidence substantially supporting the verdict against Wolf.' ''

Contrary to Dr. Wolf's contention that this statement indicates that the judge did not consider the question of sufficiency of the evidence before granting the new trial, it appears to us that the judge did consider the matter and only in part supported his determination by referring to the fact that the opinion in *Love* v. *Wolf* stated that there was evidence of ''great weight'' of Dr. Wolf's liability.

We hereinafter, in connection with defendant Park-Davis' appeal, discuss the claimed misconduct of the judge which both defendants contend was prejudicial and showed bias of the court in favor of the plaintiff. In his reply brief defendant Wolf lays emphasis on the rulings of the court in permitting a few leading questions of Doctor Wells, one of plaintiff's medical witnesses. We find no abuse of discretion in this respect. While there appeared to be an element of harshness towards defense counsel on a few occasions, an examination of the entire record discloses that, as the court stated on more than one occasion, he was acting impartially. It is rather peculiar that if, as defendant Wolf claims, the court showed bias in favor of plaintiff, the jury brought in a verdict against plaintiff and in favor of defendant Wolf.

The trial court did not abuse its discretion in granting plaintiff a new trial as against defendant Wolf.

B. *Parke-Davis appeal from judgment.*

1. (a) Later warning label.

The court admitted in evidence over objection the label warning placed by Parke-Davis on its chloromycetin packages

in 1961, which was subsequent to the use of the drug by plaintiff. That warning carried admonitions about the association of the drug and aplastic anemia similar to those on the 1952 warnings but was more extensive and contained more detailed recommended precautions as to use. The court in admitting the later label stated that it "has this pertinence, that perhaps this warning should have been made earlier."

Although "It is the general rule in this state that evidence of precautions taken and repairs made after the happening of the accident is not admissible to show a negligent condition at the time of the accident" (*Daggett* v. *Atchison, T. & S. F. Ry. Co.* (1957) 48 Cal.2d 655, 660 [313 P.2d 557]), such evidence may be admitted to impeach the testimony of a witness who has testified that the condition prior to the accident was not a dangerous one. (*Daggett* v. *Atchison, T. & S. F. Ry. Co., supra,* 661; *Hatfield* v. *Levy Bros.* (1941) 18 Cal.2d 798, 809 [117 P.2d 841]; *Pierce* v. *J. C. Penney Co.* (1959) 167 Cal.App.2d 3, 7 [334 P.2d 117].) It has also been held that such evidence is admissible "on the possibility or feasibility of eliminating the cause of the accident." (*Baldwin Contracting Co.* v. *Winston Steel Works, Inc.* (1965) 236 Cal.App.2d 565, 573 [46 Cal.Rptr. 421].)

In the instant case there was evidence that the 1952 warning label, the one on the drug at the time prescribed by Dr. Wolf, was ambiguous, inadequate and incomplete and that Parke-Davis was aware thereof. Several expert witnesses testified that the warnings, cautions and directions contained in the 1961 warning label should have been given to the medical profession in 1958. Dr. Wolf testified that had he received the 1961 warning he would not have prescribed chloromycetin for plaintiff. He further testified that the majority of doctors in his community had changed their thinking about chloromycetin and were now following the 1961 warning. Parke-Davis contended that the 1952 warning was entirely clear and adequate and essentially the same as the 1961 one. Thus, evidence of the change in warning was admissible to impeach the testimony of the Parke-Davis officials in this respect and to show the feasibility of eliminating unclear warning of the earlier date, which the jury found to be a causative factor in producing plaintiff's disease.

When the 1961 warning was offered in evidence, Parke-Davis' attorney objected: "This is three years after anything has happened in the case." In the discussion between counsel and the court, the court stated in effect that it was admissible

to show that the warning should have been made earlier. It is apparent that the label was admitted for all purposes. No request was then or at any other time made for a limiting instruction nor when defendant's attorney made reference to it in argument was any objection made to his statement.

In *People* v. *White* (1958) 50 Cal.2d 428, 430 [325 P.2d 985], certain evidence was inadmissible except for impeachment purposes. It was admitted without limitation. On appeal it was held that as it was admissible on one ground there was no error in admitting it, and that the right to complain of its admission was waived. (To the same effect *Rupp* v. *Summerfield* (1958) 161 Cal.App.2d 657, 662 [326 P.2d 912].)

▮ If there was error in the admission of the label, such error was not prejudicial in view of the fact that the 1961 warning was properly before the jury for impeachment purposes and that the doctors testified without referring to the label that, in effect, the information contained thereon was known to Parke-Davis in 1958 and that it should have warned the medical profession thereof at that time. Moreover, there was evidence that the overpromotion of chloromycetin by Parke-Davis caused doctors, including Dr. Wolf, to disregard the warnings, even the 1961 warning, and hence Parke-Davis' liability is based more on this overpromotion than on the failure to include in the 1952 warning the matter included in the later warning.

1 (b) Dr. Wolf's testimony.

On cross-examination of Dr. Wolf, plaintiff's attorney (over Parke-Davis' objection that it called for "hindsight" and "speculation") asked the doctor that if he had had a warning from Parke-Davis of certain matters concerning the use of chloromycetin would he have prescribed it for Mrs. Love, to which the doctor replied, "No." No mention was made during these questions of the 1961 label, but it is obvious that the questions related to matters stated on the later label.

▮ In view of defendant Wolf's testimony that in prescribing chloromycetin he had relied at least in part upon representations made by Parke-Davis through its advertising and its detail men, plaintiff was entitled to cross-examine him as to what he would have done had he known certain matters which defendant Parke-Davis claimed that Dr. Wolf, as a medical man, was under a duty to know concerning the drug he was administering. An important factor in the case was Dr. Wolf's state of mind in 1958 as to the use of chloromycetin,

particularly the part that Parke-Davis played in affecting it. ▆ "The state of mind of a person . . . is a fact to be proved like any other fact when it is relevant to an issue in the case, and the person himself may testify directly thereto." (*Cope* v. *Davison* (1947) 30 Cal.2d 193, 200 [180 P.2d 873, 171 A.L.R. 667].) "[A] witness may always testify to the state of his own mind when it becomes a material fact in the case." (*Peskin* v. *Squires* (1957) 156 Cal.App.2d 240, 249 [319 P.2d 405].) ▆ So the testimony was admissible as against defendant Wolf. Likewise, it was admissible against Parke-Davis to show that its failure to warn concerning these matters contributed to the improper administering of the drug.

2. Refusal of instruction.

▆ Parke-Davis offered the following instruction which was refused: "If you should find the evidence that the plaintiff, Carney Love's present condition as alleged in this case was the result of her physical and bodily condition and constitutional composition and not proximately caused by any act or omission of defendants, then you are hereby instructed that your finding must be against the plaintiff, Carney Love."

▆ The language of the instruction is vague particularly to a layman in view of the fact that as set forth in *Proctor & Gamble Co.* v. *Superior Court* (1954) 124 Cal.App.2d 157, 162 [268 P.2d 199], "It has been held that if a seller knows or should know that an article sold by him is dangerous to *some* persons, even though few in number as compared with the number of users of the article, he is negligent if he fails to warn the ignorant of the hidden danger. (46 Am.Jur. 932, sec. 808; Ann., Unusual Susceptibility to Injury, 121 A.L.R. 464; 26 A.L.R.2d 973.)" ▆ Even though the instruction included the words "not proximately caused by any act or omission of defendants," the language of the instruction is such that a juror could very well get from it the idea that if plaintiff had any unusual susceptibility or allergy to chloromycetin (if that is what is meant by "her physical and bodily condition and constitutional composition") plaintiff could not recover.

As said in *Love* v. *Wolf, supra,* at page 395: "In the case of a drug it has been held that there is a duty to exercise reasonable care to warn of potential dangers from use even though the percentage of users who will be injured is not large."

An examination of the record shows that the jury was fully instructed on Parke-Davis' theory of the case. There was no error in refusing the instruction as it was vague and misleading.

3. Alleged misconduct of the judge.

We now proceed to determine whether the record indicates that in the trial of the action the trial judge appears to have shown bias towards plaintiff or lack of impartiality. If he did it would affect the judgment against Parke-Davis and the orders granting new trial as against both Parke-Davis and Dr. Wolf.[2]

Both defendants cite some 36 instances of actions which they contend showed the jury that the judge was biased in plaintiff's favor. Of these, in only four instances did the defendants object to the statements of the court; in none did they ask for an instruction to the jury.

As said in *Karwoski* v. *Grant* (1938) 30 Cal.App.2d 171, 178 [85 P.2d 944] : ''In order to avail themselves of the benefit of alleged prejudicial utterances or conduct of a trial judge, exception to the remarks or an assignment of misconduct must be reserved during the process of the trial.'' Of course if the record shows ''a persistent course of conduct on the part of the trial judge from which it is apparent that objection would have been useless or that the acts complained of are of such a character that no admonition to the jury would have removed their effect, if any,'' then the absence of an assignment of error during the trial will not preclude one from raising the point on appeal. (Pp. 178-179.)

We have examined the record and while we find that in five statements the judge's comments were injudicious and should not have been made, we do not believe that they could have affected the jury's verdict. These five statements follow. (Read out of context with the rest of the record they sound more serious than they actually were.)

At the conclusion of plaintiff's testimony the judge said : ''All right, Mrs. Love, then you will be excused. Thank you very much, and *I wish you good luck.''* (Italics added.)

During the time Mrs. Love was on the witness stand, it was obvious that she was a very ill woman, greatly distressed by the ordeal of examination and cross-examination and embarrassed by the physical change in her appearance. Undoubtedly the judge's statement was not intended as an expression of

---

[2]If such partiality were shown, one ordinarily would expect a verdict against Dr. Wolf as well as the one against Parke-Davis.

sympathy for her cause but for her ill condition, nor do we think that the jury regarded it in any other light. In a lawsuit the judge is expected to suppress any feeling of compassion for the litigants.

Parke-Davis' counsel, during cross-examination of Dr. Cregar: "Q. But she did have a surgical procedure at that time without any adverse hemorrhaging effects, isn't that true? The court: Yes, with his explanation. Mr. Dyer [Parke-Davis' counsel]: Well, your Honor, may I please continue with this cross-examination? The Court: Yes, you may *but I don't want you to try to destroy his* testimony." (Italics added.) Later on redirect examination, when counsel for Parke-Davis objected to a question as leading, as putting words in the doctor's mouth, the court observed: "You can't put any words in this Doctor's mouth. *He knows more than all of you attorneys.*" (Italics added.) During the redirect examination of Dr. Cregar the judge said: "Thank you very much for the information you were able to impart. *He was less disturbed by cross-examination than a good many doctors.*" (Italics added.) Dr. King (Parke-Davis' witness), who had been acting medical director of the Food and Drug Administration and who testified to wide experience with chloromycetin, was testifying when the court stated: "Well, we can't go along this way too long. You are not getting any information particularly helpful to the jury. You claim to be an expert on chloromycetin?"

In the instances mentioned the judge's comments were unfortunate but in the overall picture of the trial viewed from the voluminous record (the reporter's transcript covers 2,586 pages) could not have been prejudicial. The other assignments of misconduct are primarily based upon questions asked by the judge who apparently thought that the matters concerning which he asked needed clearing. On two occasions he was unduly impatient with defense counsel. However, he informed the jury that he did not favor either party, that he was trying the case fairly and impartially as to both parties, that the jury was the sole judge of the facts, that he wanted the jury to have all the legitimate information it could get, and in that respect he was not going to sit as an "umpire" or a "referee" but would, when he deemed it necessary to elicit pertinent facts, ask questions.

 "[A] judge is not a mere umpire presiding over a contest of wits between professional opponents, but a judicial

officer entrusted with the grave task of determining where justice lies under the law and the facts between the parties who have sought the protection of our courts. Within reasonable limits, it is not only the right but the duty of a trial judge to clearly bring out the facts. . . .'' (*Estate of Dupont* (1943) 60 Cal.App.2d 276, 290 [140 P.2d 866].)

The comments made by the judge were in connection with rulings, and on one or two occasions the judge held the questions objectionable even though no objections were made by counsel, and, within his discretion, he permitted a few leading questions. On a few occasions the judge exhibited some acerbity toward defense counsel which he should not have done. We cannot say after a full examination of the entire record that it appears that the judge exhibited bias or prejudice or that the few instances in which he acted irregularly could have resulted in prejudice.

4. Verdicts not inconsistent.

Parke-Davis contends initially that the verdict against it and the verdict in favor of Dr. Wolf were inconsistent and that therefore it is entitled to a reversal of the judgment. It contends that there was a vital difference in the evidence at the second trial from that in the first trial on the critical point of whether Dr. Wolf had ordered the refills. Dr. Wolf had written a single prescription on November 4. At the first trial he testified that he did not think that he had authorized any of the refills but that he could not be sure of this and that one or more might have "slipped through." At the second trial he conceded that he had so testified. At the first trial the pharmacist testified that all the refills had been authorized by the doctor. Parke-Davis contends that the jury verdict in the pharmacist's favor and against Dr. Wolf at the first trial constituted a factual finding that the refills were authorized.

At the second trial Dr. Wolf testified definitely and categorically that he had not authorized any refills of either prescription, and that if he had authorized refills he would have been guilty of malpractice. Thus, says Parke-Davis, the finding of the jury in the doctor's favor is a finding that he did not authorize the refills. Hence the alleged negligence of Parke-Davis in "over-promotion" could not have been a proximate cause of any refill or of injury to plaintiff resulting from any refill. At most, then, reasons Parke-Davis, the "overpromotion" could only have been the proximate cause of the two prescriptions being administered. Dr. Hall, who

had examined plaintiff at the request of one of defendant Wolf's attorneys, testified that plaintiff's condition was due to what "conceivably is very light dosage of the chloromycetin." His determination that she had received only a "light dosage" was based on Dr. Wolf's record, which showed merely the two prescriptions and not the six refills. He opined that plaintiff had a "hypersensitivity reaction similar to the reactions that occur from light dosage with other drugs." Dr. Hall had not been aware that plaintiff had received eight dosages of the drug.

It was stipulated that if eight dosages were given plaintiff blood studies should have been made by Dr. Wolf before giving that many, that they were not made, and that the administering of that much chloromycetin for a gum condition would not have been good medical practice.

Parke-Davis contends that other than the testimony given by Dr. Hall no medical testimony was adduced at either trial that administering either or both of the prescriptions were with reasonable medical certainty the medical cause of plaintiff's injuries. Dr. Wolf testified that in his opinion plaintiff's difficulties were caused by the total amount of chloromycetin taken by plaintiff between September 1958 and February 1959. Dr. Carpenter supported this view. Dr. Cregar testified that from the study made at Oklahoma State Penitentiary he believed that small dosages over a long period of time tended to be more conducive to blood dyscrasias than any other type of treatment. Therefore, contends Parke-Davis, as Dr. Wolf was found not negligent, it should have been similarly exonerated, and hence the two verdicts are inconsistent. Where on the same facts verdicts are inconsistent, a complete new trial as to both defendants is necessary. (*Ferroni* v. *Pacific Finance Corp.* (1943) 21 Cal.2d 773, 780 [135 P.2d 569].)

However, the verdicts in the case at bench are not necessarily inconsistent. The liabilities of the two defendants were not interdependent in the sense that the jury was legally or logically compelled to return verdicts of liability as to both. The theory concerning Parke-Davis' negligence was that by aggressive and misleading overpromotion of the drug and failure to properly warn of its dangers, doctors, and particularly, Dr. Wolf, were caused to misuse and overdose chloromycetin. The theory of Dr. Wolf's negligence was that he failed to inform himself sufficiently, from sources other than Parke-Davis, concerning the use of this dangerous antibiotic,

to warn Mrs. Love of the potential hazards inherent in the use of the drug, to make blood studies during the course of the treatment, and that he authorized the refills of the drug. A reasonable interpretation of the jury's verdicts is that the jury found in effect that Parke-Davis was negligent as charged. The jury could have found in spite of Dr. Wolf's denial that he did so that the doctor did authorize the refills. The jury had before it his contradictory testimony at the two trials. Further, it could have found that Dr. Wolf's negligence was not proved in that the jury believed that he was entitled to and did rely on Parke-Davis' representations and failure to properly warn him of the dangers of its use, and that but for Dr. Wolf's reliance on Parke-Davis' representations he would not have used the drug and there never would have been any refills. This could have been the basis of the jury's verdict in Dr. Wolf's favor whether it found that he did or did not authorize the refills. ■■■ " 'The plaintiff is not required to establish the fact of causation with absolute certainty. It is sufficient that he introduces evidence from which reasonable men may conclude that it is more probable that the defendant's conduct was a cause than that it was not.' " (*Barclay Kitchen, Inc.* v. *California Bank* (1962) 208 Cal.App.2d 347, 354 [25 Cal.Rptr. 383].) The fact that the jury's decision as to Dr. Wolf was considered factually unsound by the judge does not make that decision irreconcilable with its decision as to Parke-Davis.

■■■ The law is "well settled that where there is concurrent negligence contributing proximately to the happening of an accident, the exoneration of the one tort-feasor, even without legal justification, does not operate to exonerate the other." (*Ohlson* v. *Frazier* (1934) 2 Cal.App.2d 708, 715 [39 P.2d 429].)

The cases cited by Parke-Davis on the question of inconsistent verdicts are not in point. *Ferroni* v. *Pacific Finance Corp., supra,* 21 Cal.2d 773, dealt with the reversal of a judgment for refusal of the admission of evidence that the defendant who was held liable was merely the agent of the defendant who was exonerated. In *Hoffmann* v. *Lane* (1936) 11 Cal.App.2d 655 [54 P.2d 477], the owner of a truck and the driver were held liable for the plaintiff's injuries. The trial court granted a new trial as to the defendant driver alone. The reviewing court held that since the liability of the owner depended both legally and factually upon the liability of the driver, the new trial should include both defendants.

*Gardner* v. *American Brake etc. Co.* (1944) 24 Cal.2d 686 [151 P.2d 122], and *Bird* v. *McGuire* (1963) 216 Cal.App.2d 702 [31 Cal.Rptr. 386], dealt with situations where judgments were obtained against both the principal and the agent and new trials were granted the agent, the reviewing court holding that new trials should have been given the principals as well.

C. *Defendant Parke-Davis appeal from order granting new trial on damages alone.*

1. Effect of section 573 of the Probate Code.

As stated, Carney L. Love died subsequent to the granting of new trials and the appeals herein.

Prior to 1946 a cause of action for personal injury did not survive the death of either party. Following the decision in that year in *Hunt* v. *Authier*, 28 Cal.2d 288 [169 P.2d 913, 171 A.L.R. 1379], holding that a cause of action for wrongful death against a tortfeasor survived the death of the injured person, the Legislature in 1949 enacted Civil Code, section 956, which provided for the survival of personal injury actions but limited the damages recoverable in the event the injured person died before judgment. In 1961 this section was repealed and section 573 of the Probate Code was adopted. This section is similar to former section 956 except that section 573 allows the recovery of punitive damages after a plaintiff's death, while former section 956 prohibited recovery of such damages.

Section 573 provides in pertinent part: "When a person having a cause of action dies before judgment, the damages recoverable by his executor or administrator are limited to such loss or damage as the decedent sustained or incurred prior to his death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had he lived, and shall not include damages for pain, suffering or disfigurement. . . ." The first question to be considered in determining the effect of section 573 in connection with the order granting new trial on damages alone is whether this section would apply at that trial. To determine this we must first decide whether plaintiff's death was "before judgment," as the section only applies "When a person having a cause of action dies before judgment."

It seems obvious that there is no final *judgment* in this case. An examination of the Recommendation and Study of the California Law Revision Commission Relating to Survival of Actions (October 1960) discloses that while comment is made

upon other elements of the recommendation for the survival statute, none is made concerning whether the word "judgment" in the phrase "When a person having a cause of action dies before judgment" means "final" judgment. Nor is there any indication by the Legislature in enacting section 573 that the words were intended to have any different meaning from that of their use in other parts of the codes, namely, "final judgment." In the above mentioned comment it is pointed out that the heirs of a deceased injured person should not receive compensation for that person's pain, suffering and loss of life expectancy. If this reasoning is logical, then it would apply to a death anytime before *final* judgment where for any reason the trial judgment were set aside.

The superior court judgment was set aside in its entirety when the court granted a new trial as to damages. "Taking out that recovery, nothing effective as a judgment remains in existence." (*King* v. *Goldberg* (1958) 159 Cal.App.2d 543, 545 [323 P.2d 1035].) As there can be only a single judgment in an action (see *Watson* v. *McEwen* (1964) 225 Cal.App.2d 771, 774 [37 Cal.Rptr. 677]), if the order granting the limited new trial on damages is to stand, there will be no final judgment until the trial of that issue ends and the determination of the appeal, if any, from the then judgment.

If the order does not stand, the judgment set aside by the order for new trial would be restored and then become final unless reversed. We find nothing in the statute which would require a reversal of a judgment merely because the successful plaintiff died while that judgment was on appeal. Thus, in this case, we would not be concerned with section 573 were it not for the order granting new trial and plaintiff's waiver of her right to a new trial if on that trial section 573 applies.

2. Plaintiff's waiver of limited new trial.

Plaintiff waives any right to a retrial as against Parke-Davis and consents to a reversal of the order granting a limited new trial in the event we determine that on a retrial of the issue of damages either as to Parke-Davis or as to Dr. Wolf, or both, the measure of damages would be that set forth in section 573. As we have determined the measure of damages on a retrial would be that set forth in section 573, and as the order granting the new trial was at plaintiff's request and in plaintiff's favor, we can find no reason why plaintiff's waiver should not be accepted and the order reversed. Parke-Davis cannot be injured thereby. It objects to a retrial of the damages issue alone. It has pending its appeal from the judg-

ment, and if successful it would have a new trial on the issues of both damages and liability. Moreover, the question of inadequacy of damages now becomes moot for the reason that it is obvious that on a new trial plaintiff could not reasonably expect to prove damages in excess of the amount the jury awarded. It appears that the interests of justice require that, as requested by both plaintiff and defendant Parke-Davis, the order granting the limited new trial be reversed.

Plaintiff seems to concede that if the trial court's granting of a limited new trial was based upon an implied finding that the damages awarded were so inadequate as to indicate a compromise verdict, then the court should have granted Parke-Davis a new trial on all issues, as a compromise verdict would . indicate the jury might have compromised on both liability and damages. Plaintiff then states that before we can accept his waiver of the limited new trial we must determine whether the record indicates a compromise type of verdict. We are satisfied that the verdict which was a substantial one was not such a type and that the court's granting of a new trial on damages alone was simply because it felt that the damages granted were too low, particularly in view of the award at the first trial. As there will be no new trial it becomes unnecessary for us to determine the validity of the court's order.

D. *Partial satisfaction of judgment.*

As hereinbefore stated, the first trial resulted in a judgment against both defendants for $334,046. On June 29, 1962, Dr. Wolf's insurance carrier paid plaintiff $102,154.77 in "partial satisfaction" of that judgment and without waiver of his right to appeal. May 11, 1963, Dr. Wolf's carrier paid plaintiff $23,741.12 for interest due on the remainder of the judgment and costs owing. On October 16, 1964, Dr. Wolf filed in this court a petition for writ of prohibition to stay the second trial until the amount paid was returned.[3] The petition was denied.

The "Partial Satisfaction of Judgment" is a rather peculiar document. It acknowledges receipt by plaintiff from defendant Wolf of $102,154.77 "in partial satisfaction" of the first judgment. It then provides that the payment in partial satisfaction of that judgment "is not a waiver, express or implied, of the judgment debtor's right to appeal from the verdict of the jury, and the judgment creditor, by this agree-

---

[3]John Wolf, Petitioner v. The Superior Court in and for the County of Shasta, Respondent, and Carney Love, Real Party in Interest, 3 Civil No. 11050.

ment, hereby acknowledges the right of the judgment debtor to appeal the verdict of the jury.''

Also attached to defendant Wolf's pretrial statement is a ''Receipt For Interest on the Judgment.'' It recites the filing of the first judgment and its amount, the filing of plaintiff's memorandum of costs and disbursements and its amount, the payment by defendant Wolf to plaintiff of $102,154.77 and the amount of interest due on the total judgment to the date of that payment, the amount due on the balance of the judgment, and the amount unpaid on the costs. It then acknowledged receipt of the sum of $23,741.12, ''the total amount of the cost bill, together with all interest due'' on the judgment.

Nothing is stated in either document as to what should happen to the payments in the event of a reversal of that judgment.

Section 877 of the Code of Civil Procedure provides in pertinent part: ''Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort—

''(a) . . . [I]t shall reduce the claims against the other in the amount stipulated by the release, the dismissal, or the covenant, or in the amount of the consideration paid for it whichever is the greater.''

Defendant Parke-Davis contends that its proposed instruction requiring a deduction of defendant Wolf's payments from any damages awarded plaintiff by the jury should have been given the jury, or that the deduction should have been made by the court. No evidence of these payments was introduced nor was any motion made that the court make such deduction. The matter came up in the presentation of the motions for new trial. Plaintiff's counsel referred to these payments as indicating that defendant Wolf recognized his liability to plaintiff. Thereupon a discussion ensued between plaintiff's counsel and defendant Wolf's counsel as to whether these payments were made to avoid execution; plaintiff's counsel denying that they were made for that purpose and defendant Wolf's counsel insisting that they were. Parke-Davis' counsel declined to comment. No request was made by Parke-Davis for any reduction of the judgment by the court because of these payments.

Plaintiff contends that section 877 cannot apply as the

documents here are neither ''a release, dismissal . . . or a covenant not to sue.'' Moreover, that as there was no evidence before the jury of these payments the court properly refused to give the proposed instruction, and that, because evidence of the payments was not presented to the court, nor was it asked to act concerning them, the matter of these payments is not before this court.

In view of the fact that neither the partial satisfaction nor any evidence thereof was before the jury, the court properly refused to give the proposed instruction. Likewise, as the record is silent upon the subject and no motion was made, the trial court was not required to take any action concerning it, nor can we pass upon its effect nor deal with it in any way. As stated, the only way it appears is as an exhibit attached to defendant Wolf's pretrial statement. Under rule 211, California Rules of Court, it is not a part of the record in this case. That rule provides in part: '' (d) The pretrial conference, or any part thereof, other than the pretrial conference order as filed, shall not be referred to at the trial. . . .''

Our ruling is based solely on the fact that, as we have stated, the matter of the partial satisfaction of judgment was not properly an issue before the jury and the trial court and it is not an issue here. The ruling is completely without prejudice to a determination of the partial satisfaction's effect as between any and all parties to this litigation in any other proceeding or proceedings.

The order granting plaintiff a limited new trial as against defendant Parke-Davis is reversed. The judgment in favor of plaintiff and against defendant Parke-Davis is affirmed. The order granting plaintiff a new trial as against defendant Wolf is affirmed. Plaintiff will recover costs.

Pierce, P. J., and Friedman, J., concurred.

A petition for a rehearing was denied April 19, 1967.