[No. A050344. First Dist., Div. Four. Jan. 23, 1996.]

IDA MAY KELLOGG et al., Plaintiffs and Respondents, v.
ASBESTOS CORPORATION LIMITED, Defendant and Appellant.

COUNSEL

James C. Parker, Stevens, Drummond & Gifford, Gary T. Drummond and Joseph J. Kubancik for Defendant and Appellant.

Low, Ball & Lynch, Raymond Coates, Debevoise & Plimpton, Roger E. Podesta, Jonathan E. Richman, William S. Adams, Wright, Robinson, McCammon, Osthimer & Tatum, Peter B. Logan, Morgenstein & Jubelirer, Eliot S. Jubelirer, Samantha J. Smith, Jackson & Wallace, John R. Wallace, Charles Bond and Charles Marx as Amici Curiae on behalf of Defendant and Appellant.

Kazan, McClain, Edises & Simon, Steven Kazan and Bryce C. Anderson for Plaintiffs and Respondents.

Connerton, Ray & Simon, Shepard A. Hoffman, Cartwright, Slobodin, Bokelman, Borowsky, Wartnic, Moore & Harris and Harry F. Wartnick as Amici Curiae on behalf of Plaintiffs and Respondents.

OPINION

**REARDON, J.**—Plaintiffs Harry and Ida May Kellogg, husband and wife, filed this asbestos-related personal injury action against several named

defendants on September 24, 1987. Harry Kellogg (Kellogg) claimed that he had contracted pleural mesothelioma, a fatal lung disease, following continuous exposure to asbestos and asbestos-related products, including asbestos fibers produced, sold and shipped to Kellogg's employer by appellant Asbestos Corporation Limited (ACL), a Canadian corporation. Ida May Kellogg's claim was based on loss of consortium. At trial, ACL was the only defendant still in the action.

Following a court trial, ACL appealed from the judgment entered against it and in favor of the Kelloggs. Although ACL contested its liability at trial, it now raises several issues relating to damages and costs: (1) since Kellogg died after submission of the case but before final judgment, whether the award may include damages for his pain and suffering; (2) whether Proposition 51 (Civ. Code, § 1431.2) applies to this case; (3) whether Kellogg's offer of compromise was sufficient to allow recovery of added costs; and (4) whether the trial court's statement of reasons was sufficient to identify the damages and costs. Because Kellogg died after submission of the case but before final judgment, and because the trial court's statement of decision did not sufficiently identify the extent to which his award included damages for his pain and suffering, we reverse that portion of the judgment awarding damages to Kellogg.

## I. FACTS AND PROCEDURAL HISTORY

### A. *Facts*

Plaintiff Kellogg worked for Fibreboard Corporation[1] at its Emeryville facility from 1930 to 1962. During most of those 32 years, Kellogg was exposed, directly or indirectly, to asbestos and asbestos-related products.

From 1930 to 1948, and again from 1960 to 1962, Kellogg worked in the roofing laboratory where he tested the quality of raw materials, including asbestos. During the testing process, Kellogg would take an asbestos sample and shake it through a sieve to determine the length of the asbestos fibers. In addition to this direct handling of asbestos, Kellogg was exposed to asbestos dust from an adjacent roofing and black paint department.

From 1941 to 1948, Kellogg worked part-time, and from 1948 to 1960 he worked full-time, in Fibreboard's power plant. In doing so, he was exposed to asbestos dust from the nearby insulation manufacturing plant.

---

[1]During Kellogg's employment, his Emeryville employer went through several corporate name changes due to mergers and acquisitions. These names included the Paraffine Companies, Plant Rubber & Asbestos Works, PABCO Industrial Products, Fibreboard Paper Products Corporation, and Fibreboard Corporation. For ease of reference, Kellogg's employer will be referred to as "Fibreboard."

Throughout his employment at Fibreboard, Kellogg was also exposed to asbestos whenever repair work was done to the insulation within the plant. Kellogg testified that he was unaware that asbestos could cause lung disease or cancer. He was never told to wear a mask while working.

In 1987, 25 years after leaving Fibreboard, Kellogg was a robust 80-year-old. In July 1987, he first experienced shortness of breath, a nonproductive cough, and chest pains in his right side. In September 1987, Kellogg was diagnosed with pleural mesothelioma, a virulent form of cancer of the pleural lining of the lung caused by exposure to asbestos. He was told that his condition was incurable and that he had 24 to 30 months to live.[2]

During Kellogg's employment, Fibreboard purchased asbestos from several suppliers, including ACL, a Canadian corporation which mined, processed, and sold asbestos fiber. Between 1932 and 1963, ACL shipped more than 50,000 tons of asbestos fiber to California, much of it to the Fibreboard plants at Emeryville and Redwood City. ACL was the main supplier of chrysotile asbestos fiber to Fibreboard.

Kellogg's medical testimony was uncontradicted. According to Dr. Barry Horn, mesothelioma is almost unknown in the population as a whole, but is common among those with a history of exposure to asbestos dust. The only established cause of mesothelioma is exposure to asbestos dust. In contrast to other asbestos-related diseases, very little exposure to asbestos is required to put an individual at considerable risk for developing mesothelioma. But if an individual has more exposure to asbestos, the risk of mesothelioma can be extremely high. In response to hypothetical questions, Dr. Horn expressed his opinion that even if ACL had provided only a portion of Fibreboard's supply of raw asbestos during separate periods of Kellogg's employment history, each period of exposure alone would have played a substantial role in the development of his mesothelioma. The latency period for mesothelioma—i.e., "the length of time from the onset of exposure before the clinical expression of a disease process"—could continue for several decades. Dr. Horn said that it was "very typical for that to occur."

B. *Procedural History*

The court trial in this case, including testimony and final arguments, lasted nine days, but it took approximately twenty months before judgment

---

[2]Kellogg actually died within a year, on August 14, 1988, after the case was taken under submission but before judgment was entered. This factual circumstance underlies one of the issues on appeal.

was entered. Testimony commenced on July 1, 1988, and was completed on July 20, 1988, when the matter was taken "under submission subject to argument."[3] The parties argued on August 8 and 9, 1988, and the matter was finally submitted. Kellogg died five days later, on August 14, 1988. Judgment was entered on April 6, 1990.

Between final arguments and entry of judgment, there were extensive posttrial proceedings. On August 30, 1988, the court filed a tentative decision, awarding $800,000 damages to Harry Kellogg and $100,000 to Ida May Kellogg. On March 14, 1989, the trial court filed an initial statement of decision[4] in which it credited ACL with settlements the Kelloggs had received earlier, allocating $225,333 to Harry Kellogg's personal injury claim and $28,167 to Ida May Kellogg's loss of consortium claim.[5]

In April 1989, the court ordered each side to submit points and authorities on the applicability of Proposition 51. In response, Kellogg contended his. cause of action accrued before Proposition 51 became effective in June 1986, while ACL contended that Kellogg's cause of action accrued when his mesothelioma was discovered or diagnosed in September 1987, after Proposition 51 became effective. Following a hearing on the issue, the court on August 15, 1989, ruled that Proposition 51 did not apply to Harry Kellogg's cause of action, but that it did apply to that of his wife.

On April 6, 1990, the trial court filed its final statement of decision and judgment. It ordered that Kellogg recover $800,000 from ACL, less $225,333 credit for previous settlements with other defendants and $4,064 for workers' compensation benefits, for a net judgment of $570,603. The court ordered that Ida May Kellogg recover $100,000 from ACL less

---

[3]When discussing the dates for final argument, Kellogg's attorney expressed concern over the rapidly declining health of his client, and asked the court to order the matter to be submitted immediately. Counsel believed that if that was done, "it would withstand any problems if Mr. Kellogg passes away [before final arguments]." The trial judge said he would "do the best I can to accommodate you" and took the case "under submission subject to argument." The defense did not object to this procedure.

Counsel's action was apparently intended to trigger Code of Civil Procedure section 669, discussed *post*, which authorizes the rendering of a judgment in a court trial if a party dies after trial and submission of the case to the judge.

[4]In its request for statement of decision filed September 12, 1988, ACL had raised for the first time the issue as to whether Proposition 51 applied to this case. It asked: "Under Civil Code §§ 1431.1-1431.5, what amount of plaintiffs' damages are allocated to defendant Asbestos Corporation Limited?" Although there were brief references to Proposition 51 at a March 9, 1989, hearing on the parties' proposed statements of decision, the trial court did not address that issue in its statement of decision filed March 14, 1989.

[5]Kellogg's attorney later stipulated that ACL was entitled to an additional credit of $27,064, based on a workers' compensation award to plaintiffs.

$28,167 for previous settlements with other defendants and $23,000 for workers' compensation benefits, for a net judgment of $48,833.

In support of its decision, the trial court made several findings, including findings that ACL's asbestos fibers were a legal cause of Kellogg's mesothelioma, and that Ida May Kellogg "has suffered a loss of consortium as a result of her husband's exposure to" ACL's asbestos.

Concerning Proposition 51, the court restated its earlier ruling that Kellogg's cause of action arose before the enactment of Civil Code section 1431 et seq., and therefore the statute did not apply. It therefore ordered that ACL was liable for the entire amount of damages awarded to Kellogg.

The court found that Proposition 51 applied to Ida May Kellogg's cause of action for loss of consortium "in that she suffered the injury underlying this action and her cause of action accrued after the effective date of the statute. However, the court having found [ACL] strictly liable for damages caused to plaintiffs, cannot, based upon the evidence introduced at trial, allocate fault in this matter pursuant to Civil Code § 1431.2. The court therefore finds that 100% of the liability for plaintiff IDA MAY KELLOGG's damages be allocated to defendant [ACL]."

## II. DISCUSSION

### A. Effect of Kellogg's Death Before Judgment on Award of Damages

On August 9, 1988, each side finished its closing arguments and the trial court ordered the matter submitted. Five days later, on August 14, 1988, Kellogg died. On August 30, 1988, the court filed its tentative decision. The court entered judgment on April 6, 1990.

At the time of trial, former Probate Code section 573, subdivision (c) (hereafter section 573(c)), provided: "Where a person having a cause of action dies before judgment, the damages recoverable by his or her personal representative are limited to the loss or damage the decedent sustained or incurred prior to death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the

decedent lived but not including any damages for pain, suffering, or disfigurement."[6] The statutory phrase "before judgment" means before final judgment. (*Love* v. *Wolf* (1967) 249 Cal.App.2d 822, 839 [58 Cal.Rptr. 42].)

■ Relying primarily on section 573(c), ACL contends that since Kellogg died before final judgment, we should reduce the judgment to the extent it includes damages for his pain and suffering.

Respondents overstate ACL's contention. They construe ACL's argument to be that the trial court could not even render a judgment, once Kellogg died. Citing Code of Civil Procedure section 669 (hereafter section 669),[7] respondents maintain that the trial court properly awarded damages for Kellogg's pain and suffering. They argue that if section 573(c) is applied in this case, it would render section 669 meaningless.

Historically, section 573(c) and section 669 have never been held to conflict with one another. ■ When faced with a potential conflict between two statutes, a court must construe the statutes in the context of the entire statutory system of which they are a part in order to achieve harmony with other statutes on the same general subject. This rule applies even when the two provisions are in different codes. (*Building Material & Construction Teamsters' Union* v. *Farrell* (1986) 41 Cal.3d 651, 665 [224 Cal.Rptr. 688, 715 P.2d 648]; *Unzueta* v. *Ocean View School Dist.* (1992) 6 Cal.App.4th 1689, 1695 [8 Cal.Rptr.2d 614].)

■ Construing these two sections together, we conclude that under section 669, because Kellogg died "after trial and submission of the case," it was appropriate for the trial court to render judgment. But under section 573(c), because Kellogg died before judgment, the scope of that judgment may not include damages for pain or suffering.

Until 1965, section 669 provided that if a party died "after a verdict or decision" but before judgment, the trial court could still render judgment. In 1965, section 669 was amended to substantially its present form, authorizing rendition of the judgment if the party died "after trial and submission of his case to a judge sitting without a jury for decision . . . ." (Stats. 1965, ch. 1636, § 1, p. 3730.) The policy behind section 669 was that if the parties had done everything they could to put the case in a posture where it was ready

---

[6] The provisions of section 573(c) have been continued without relevant change in Code of Civil Procedure section 377.34, added in 1992. (Stats. 1992, ch. 178, § 20.) For consistency, we shall refer to it as section 573(c).

[7] Section 669 provides that "[i]f a party dies after trial and submission of the case to a judge sitting without a jury for decision . . . , the court may nevertheless render judgment thereon."

for final rendition of judgment, a court delay should not be used to prejudice the parties. (*Fox* v. *Hale & Norcross S. M. Co.* (1895) 108 Cal. 478, 482 [41 P. 328]; *Scoville* v. *Keglor* (1938) 27 Cal.App.2d 17, 25 [80 P.2d 162].)

Meanwhile, the statutory history of section 573(c) traces back to 1949, when the Legislature enacted comprehensive survival provisions for personal injury and wrongful death actions. (See 3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 540, p. 567.) As part of those enactments, the Legislature passed former Civil Code section 956 (a predecessor to § 573), which limited the damages recoverable if the injured party died before judgment so as to exclude damages for pain or suffering. (Stats. 1949, ch. 1380, § 2, p. 2400.) In 1961, former section 956 was repealed and replaced by section 573, which was similar to the former section except that it allowed for the recovery of punitive damages (but not pain and suffering damages) after a plaintiff's death. (Stats. 1961, ch. 657, §§ 1, 2, pp. 1867-1868; see *Love* v. *Wolf, supra,* 249 Cal.App.2d at p. 839.)

Respondents cite several cases in which a trial court announced its decision, the party died, and the court then entered a judgment nunc pro tunc to a date before the death of the party. (See, e.g., *Norton* v. *City of Pomona* (1935) 5 Cal.2d 54, 62-63 [53 P.2d 952]; *Fox* v. *Hale & Norcross S. M. Co., supra,* 108 Cal. at pp. 480-484; *Scoville* v. *Keglor, supra,* 27 Cal.App.2d at pp. 23-24.) All but one of the cases respondents cited predates the 1949 adoption of the predecessor to section 573(c). Resort to nunc pro tunc judgments was useful in those cases to preserve causes of action which before 1949 would have been abated. In the one post-1949 case cited (*Wells* v. *Coca Cola Bottling Co.* (1956) 140 Cal.App.2d 218 [294 P.2d 955]), it is not stated in the opinion whether pain and suffering damages were awarded. The primary issue raised, as in the earlier cases, was the trial court's power to enter a nunc pro tunc order. (*Id.* at pp. 221-223.) In this case, respondents did not ask the trial court to exercise its nunc pro tunc power, nor have they raised that issue directly in this appeal. The cases respondents cite therefore do not apply. (See *Young* v. *Gardner-Denver Co.* (1966) 244 Cal.App.2d 915, 920 [53 Cal.Rptr. 522] [failure to timely request exercise of nunc pro tunc power].)

Issues substantially similar to those in this case were raised in *Williamson* v. *Plant Insulation Co.* (1994) 23 Cal.App.4th 1406 [28 Cal.Rptr.2d 751]. In that case, the trial was ordered bifurcated, with issues including causation and damages being tried in the first phase, and issues of liability and comparative fault being tried in the second phase. In the first phase, the jury

found that exposure to asbestos was a legal cause of Williamson's asbestosis, and that Williamson was entitled to economic and noneconomic damages. Toward the end of the second phase, Williamson died. After the jury found the defendant liable, the trial court entered a judgment, nunc pro tunc, as of the day before Williamson died. (*Id.* at pp. 1412-1413.)

On appeal, defendant Plant, relying primarily on section 573(c), contended that the trial court erred in entering judgment on the jury's award of the decedent's noneconomic damages. Plant argued the case fell squarely within the statute, as Williamson died " 'before judgment.' " Plant argued that the trial court, by entering judgment nunc pro tunc as of the day before he died, improperly circumvented the intended effect and policy of section 573(c), to wit, that an estate should not be enriched by compensation for suffering that was personal to the decedent, and not suffered by the estate or its beneficiaries. (*Williamson* v. *Plant Insulation Co.*, *supra*, 23 Cal.App.4th at pp. 1413-1414.)

The *Williamson* court rejected plaintiff's arguments that the entry of judgment for the noneconomic damages was proper under either common law precedent allowing entry nunc pro tunc when a party dies after the close of evidence but before judgment is rendered, or under section 669. Interpreting the language in the statute, the court held that section 669 was inapplicable, as the jury in that case had not yet returned a verdict determining Plant's liability. (*Williamson* v. *Plant Insulation Co.*, *supra*, 23 Cal.App.4th at pp. 1414-1415.) The court also found the authority to enter a judgment nunc pro tunc was inapplicable as, again, the trial therein had not progressed to the point where a judgment could or should have been rendered. (*Id.* at pp. 1415-1417.)[8]

Justice Werdegar, writing for the *Williamson* court, recognized that section 573(c) could be arbitrary in its application. "Nonetheless, a line must be drawn if section 573(c) is to have any effect at all, and in that section, the Legislature drew a clear line: noneconomic damages do not survive if the plaintiff dies before judgment." (*Williamson* v. *Plant Insulation Co.*, *supra*, 23 Cal.App.4th at p. 1417, fn. omitted.) The court concluded that the judgment had to be reversed insofar as it awarded damages for Williamson's pain and suffering. (*Id.* at p. 1418.)

Plant further contended that under section 573(c), any damages awarded for future economic losses should also be stricken. Under that section,

---

[8]As noted earlier, respondents in this case never requested the trial court to exercise its authority to issue a judgment nunc pro tunc.

damages not incurred before death are not recoverable in the decedent's action. On the record before it, the *Williamson* court could not determine what amount, if any, the jury awarded in anticipated economic damages, or what portion of the damages might actually have been suffered before Williamson's death. It therefore reversed the judgment awarding economic damages as well. (*Williamson* v. *Plant Insulation Co., supra*, 23 Cal.App.4th at p. 1418.)

The trial court's findings on damages as set forth in its statement of decision suffer from the same deficiencies as did those in *Williamson*. Having determined that Kellogg's cause of action arose before the effective date of Proposition 51, the trial court made a general finding that ACL was "liable for the entire amount of damages awarded to HARRY KELLOGG" i.e., $800,000 less specified credits. Whether or not the trial court was correct in holding Proposition 51 inapplicable to Kellogg (see *Williamson* v. *Plant Insulation Co., supra*, 23 Cal.App.4th at p. 1418, fn. 4), since Kellogg died before judgment, section 573(c) prohibited the trial court from awarding any noneconomic damages for his pain and suffering.

Although the trial court's statement of decision was silent on this issue, the record strongly suggests that a significant portion of the trial court's award was related to Kellogg's pain and suffering. Early in the trial, the Kelloggs waived any claim for punitive damages; therefore, none of the damages awarded were for that purpose. Throughout the trial, there was testimony concerning the debilitating effect the mesothelioma was having on Kellogg. The testimony concerning the medical costs already incurred was very general in nature, those costs being estimated to be in "six figures . . . ." In his closing argument, Kellogg's counsel pointed out that the "individual damages far exceed the economic damages in this case." He suggested that damages for future medical costs be awarded in the range of $100,000 to $300,000. During ACL's final argument, the trial court suggested that defense counsel not spend a lot of time discussing some damage issues, but then added that Kellogg "does have this issue of what I consider terrible pain and suffering."

On this record, it is difficult for us to conclude other than that a significant portion of the $800,000 awarded Kellogg was intended to compensate him for his pain and suffering. At the same time, we are unable to determine the actual amount of the economic damages. We are equally unable to determine what portion of the award was intended for "damage[s] the decedent sustained or incurred prior to death" in contrast to any award which may have

been given for future economic losses. (See § 573(c).) Consequently, the entire portion of the judgment awarding damages to Kellogg must be reversed. (See *Williamson* v. *Plant Insulation Co.*, *supra*, 23 Cal.App.4th at p. 1418.)

B. *Award to Ida May Kellogg*

■ The trial court made an award of $100,000 to Mrs. Kellogg as against ACL, less credits of $28,167 for prior settlements and $23,000 for prior workers' compensation benefits, for a net recovery of approximately $48,833. The court then found that Proposition 51 applied to her cause of action for loss of consortium "in that she suffered the injury underlying this action and her cause of action accrued after the effective date of the statute. However, the court having found [ACL] strictly liable for damages caused to plaintiffs, cannot, based upon the evidence introduced at trial, allocate fault in this matter pursuant to Civil Code § 1431.2. The court therefore finds that 100% of the liability for plaintiff IDA MAY KELLOGG's damages be allocated to defendant [ACL]."

Although the trial court labeled the damages awarded Mrs. Kellogg as being for "loss of consortium" (a noneconomic damages item under Proposition 51), much of the testimony at trial actually involved the "costs of obtaining substitute domestic services" on her behalf (an economic damage item in the statute). (See Civ. Code, § 1431.2, subd. (b)(1), (2).) But even if we take the trial court's finding at face value that the award was for "loss of consortium," the party who seeks to establish a fact necessary for a claim or defense has the burden of proof on that fact. (See Evid. Code, § 500.) ACL offered no evidence that persons or entities other than itself were partly responsible for Mrs. Kellogg's damages. As no such evidence was offered, the trial court's conclusion that ACL should bear full responsibility for the damages awarded to her was a correct one.

III. CONCLUSION

That portion of the judgment awarding damages to Kellogg is reversed, as well as the costs awarded pursuant to Code of Civil Procedure section 998.[9] The cause is remanded to the trial court for a limited new trial to determine

[9]Because the amount of economic damages suffered by Kellogg can only be resolved on remand, we cannot determine whether the judgment ultimately entered will be "more favorable" than the offer made by plaintiffs/respondents.

the amount of economic damages suffered by Kellogg in his lifetime due to mesothelioma and whether an award of costs is appropriate. (Code Civ. Proc., § 998.) The judgment is otherwise affirmed. The parties are to bear their own costs on appeal.

Poché, Acting P. J., and Hanlon, J., concurred.

Respondents' petition for review by the Supreme Court was denied May 15, 1996. Mosk, J., was of the opinion that the petition should be granted.