[No. A071823. First Dist., Div. One. Oct. 24, 1996.]

WILLIAM SCALICE, Plaintiff and Appellant, v.
PERFORMANCE CLEANING SYSTEMS, Defendant and Respondent.

COUNSEL

Virdeh & Virdeh and Abraham Virdeh for Plaintiff and Appellant.

Paul Peyrat as Amicus Curiae on behalf of Plaintiff and Appellant.

Fortune, Drevlow, Holmes, Carmody, Schmidt & Nakano, Nancy A. McPherson and Peter Fortune for Defendant and Respondent.

OPINION

DOSSEE, J.—William Scalice obtained a judgment against Performance Cleaning Systems for injuries caused by a fall at work on a slippery floor which Performance had maintained. The principal issue on appeal is the appropriate method of crediting workers' compensation payments against Performance's liability to Scalice under Proposition 51 (Civ. Code, §§ 1431-1431.5).[1] We hold that workers' compensation benefits are not merely "economic damages" under Proposition 51, and that the correct rule for allocating the credit is the same rule used for apportioning settlement proceeds set forth in *Espinoza* v. *Machonga* (1992) 9 Cal.App.4th 268 [11 Cal.Rptr.2d 498].

BACKGROUND FACTS

On February 4, 1993, Scalice filed an action for damages arising out of his fall on a slippery floor while at work in a Safeway Store. Performance provided janitorial and maintenance services for the store, and allegedly caused the slippery condition of the floor. Performance answered the complaint, and affirmatively alleged negligence by Scalice and his employer, Safeway, and requested a credit against the verdict for sums Scalice had received as workers' compensation benefits. Safeway filed a complaint in intervention, seeking reimbursement for workers' compensation benefits paid to Scalice.

On August 4, 1995, the jury returned a total verdict in favor of Scalice in the amount of $677,000, with $274,000 allocated to economic damages and $403,000 to noneconomic damages. Scalice was found to be 0 percent

---

[1]Unless otherwise indicated, all statutory references are to the Civil Code.

negligent, Safeway was 30 percent negligent, and Performance was 70 percent negligent. The amount of workers' compensation benefits paid by Safeway was $162,008.53, which was found to be less than Safeway's percentage of responsibility for the injuries, and Safeway received nothing on the complaint in intervention. The parties were given the opportunity to address the appropriate method of allocating the credit to Performance for workers' compensation payments received by Scalice. When the matter was heard on September 27, 1995, the court ordered that judgment be entered nunc pro tunc as of September 1, 1995. The trial court accepted the calculations submitted by counsel for Performance, as follows:

| $274,000.00 | total economic damages |
| −162,008.53 | total of workers' compensation benefits paid to Scalice |
| $111,991.47 | remaining economic damages |
| +282,100.00 | Performance's 70 percent share of noneconomic damages of $403,000 |
| $394,091.47 | Performance's liability to Scalice (before costs and interest) |

Scalice appeals, arguing that the court miscalculated the offset for workers' compensation benefits and erred in entering the judgment nunc pro tunc.

DISCUSSION

 Appellant contends that the trial court improperly deducted the entire amount of the workers' compensation benefits from economic damages, which, when coupled with the deduction mandated by Proposition 51 from noneconomic damages for the employer's fault gave respondent a double reduction. He also claims that the court improperly denied him an additional four weeks of interest by entering judgment as of September 1 instead of on the date of the verdict. Although we do not accept appellant's suggested method of calculating the workers' compensation credit, we find some merit in his argument that the court failed to properly allocate the credit. We requested supplemental briefing on this point and have reviewed briefs from respondent and amicus curiae discussing the issue in depth.

*Allocation of Workers' Compensation Benefit Payments*

Prior to Proposition 51, the amount of workers' compensation benefits paid to appellant would have been subtracted from the total verdict, for a total joint and several judgment of $514,991.47 ($677,000 minus

$162,008.53). (*Aceves* v. *Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 512 [156 Cal.Rptr. 41, 595 P.2d 619], overruled on other grounds in *Privette* v. *Superior Court* (1993) 5 Cal.4th 689, 696 [21 Cal.Rptr.2d 72, 854 P.2d 721].) Respondent's allocation, as accepted by the trial court, of 100 percent of the workers' compensation benefits to economic damages reduces respondent's liability by $120,900 from its pre-Proposition 51 liability. This result is based on respondent's characterization of workers' compensation benefits as special damages, which respondent equates with economic damages under Proposition 51. On the other extreme, appellant proposed a formula which allocates the workers' compensation benefits entirely to noneconomic damages, which would give him the same amount as he would have received prior to Proposition 51.

Although Proposition 51 was enacted in 1986, until this year no reported decision has directly analyzed the issue of the proper allocation of workers' compensation benefits after its effective date. (*DaFonte* v. *Up-Right, Inc.* (1992) 2 Cal.4th 593, 604 [7 Cal.Rptr.2d 238, 828 P.2d 140] [stating that the issue is difficult and important, but not within the order granting review in that case].) Prior to oral argument of the instant appeal, Division Four of this court filed its opinion in *Torres* v. *Xomox Corp.* (1996) 49 Cal.App.4th 1 [56 Cal.Rptr.2d 455], concluding that the proper method of allocating workers' compensation benefits under Proposition 51 is the method used for pre-verdict settlements by the court in *Espinoza* v. *Machonga, supra,* 9 Cal.App.4th 268. The *Torres* court carefully considered different approaches to the calculation as suggested by the parties, but concluded that the compromise solution used in *Espinoza* was the most suitable method of allocating workers' compensation benefits. (*Torres* v. *Xomox Corp., supra,* 49 Cal.App.4th 1, 34-37.) Although amicus curiae in the instant case has argued that the approach of the *Torres* court is not supported by the words of Proposition 51, we note that the approach advocated by amicus curiae results in a verdict that is identical to a pre-Proposition 51 verdict. After reviewing the history of the workers' compensation benefit offset, the impact of Proposition 51, and the character of workers' compensation benefits, we conclude that such benefits are in the nature of a statutorily imposed settlement, and should be treated as any other pre-verdict settlement proceeds. We find that the view expressed by the court in *Torres* v. *Xomox Corp., supra,* 49 Cal.App.4th 1, and *Espinoza* v. *Machonga, supra,* 9 Cal.App.4th 268 best serves the multiple policies at issue, without unduly favoring either side in the dispute.

*The Workers' Compensation Benefit Offset*

In general, when an employee is injured at work, the exclusive remedy against the employer is workers' compensation. (*Privette* v. *Superior*

*Court, supra,* 5 Cal.4th 689, 697.) This fact does not prevent an employee from suing a culpable third party for damages resulting from the work injury. (*DaFonte* v. *Up-Right, Inc., supra,* 2 Cal.4th 593, 598.) The employer may also make a claim against the award in a third party action for reimbursement of workers' compensation benefits paid to the employee. (Lab. Code, § 3852.) When our Supreme Court decided *Witt* v. *Jackson* (1961) 57 Cal.2d 57 [17 Cal.Rptr. 369, 366 P.2d 641], a tort plaintiff's concurrent negligence was a bar to recovery in a third party action. The *Witt* court stated that a negligent employer could not be allowed to "profit from his own wrong" and was also barred from obtaining reimbursement from the third party for workers' compensation benefits. (*Witt* v. *Jackson, supra,* 57 Cal.2d 57, 73.) The portion of the *Witt* opinion which is relevant to the instant case is the corollary to the above rule, as stated by the *Witt* court: "[s]ince, however, the injured employee may not be allowed double recovery, his damages must be reduced by the amount of workmen's compensation he received." (*Ibid.*) "In *Witt* v. *Jackson,* denial of the concurrently negligent employer's recovery from the third party was premised on the law's policy to prevent the former from taking advantage of his own wrong; while the latter's credit for workmen's compensation payments against his own tort liability was grounded on the policy of denying the employee double recovery." (*Roe* v. *Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 884, 888 [117 Cal.Rptr. 683, 528 P.2d 771], rule modified by *Associated Construction & Engineering Co.* v. *Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 829, 842 [150 Cal.Rptr. 888, 587 P.2d 684].) As noted above, we are concerned in the instant case solely with the third party's credit for workers' compensation benefits paid to Scalice, because Safeway has not appealed from the determination denying reimbursement.

In 1975, the Supreme Court decided *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d], and replaced the doctrine of contributory negligence with one of comparative negligence which assesses liability "in direct proportion to the amount of negligence of each of the parties." (*Id.* at pp. 828-829.) The impact of *Li* in a third party case was that when the third party established the employer's share of negligence, that share, up to the amount of benefits paid, was credited against the third party's liability to the plaintiff. (*Associated Construction & Engineering Co.* v. *Workers' Comp. Appeals Bd., supra,* 22 Cal.3d 829, 842.)[2]

---

[2]The court also noted that the employer would be denied any claim for reimbursement "to the extent that his contribution would then fall short of his percentage share of responsibility for the employee's total recovery." (*Associated Construction & Engineering Co.* v. *Workers' Comp. Appeals Bd., supra,* 22 Cal.3d 829, 842.)

*Impact of Proposition 51*

Following *Li*, in *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899], the court held that *Li* did not abrogate the rule of joint and several liability between tortfeasors, based on the policies that injured plaintiffs are entitled to full recovery for injuries and that wrongdoers should be left to apportion the liability among themselves. (*Id.* at p. 590.) Thus, ". . . any share of damages attributable to an insolvent tortfeasor should be apportioned equitably among the solvent tortfeasors. [Citation.]" (*DaFonte* v. *Up-Right, Inc., supra*, 2 Cal.4th 593, 595, 598.) This apportionment included any part of the damages attributable to the negligent employer which exceeded the workers' compensation payments. (*Associated Construction & Engineering Co.* v. *Workers' Comp. Appeals Bd., supra*, 22 Cal.3d 829, 842-843, fn. 9.) This joint and several liability was modified by Proposition 51, to reflect a new policy which protects the so-called ' "deep pocket" ' defendants from liability for noneconomic damages that is disproportionate to their share of fault. (*DaFonte* v. *Up-Right, Inc., supra*, 2 Cal.4th 593, 599.)

Proposition 51, adopted by the voters in 1986, and codified at section 1431.1 et seq., provides in part: "[e]ach defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount." (§ 1431.2.) In *DaFonte,* the court held that Proposition 51 "eliminates a third party defendant's joint and several liability to an injured employee for unpaid noneconomic damages attributable to the fault of the employer, who is statutorily immune from suit." (2 Cal.4th at p. 596.) Examining the statutory definitions of "economic" and "noneconomic" damages, the court stated that Proposition 51 "retains the joint liability of all tortfeasors, regardless of their respective shares of fault, with respect to all objectively provable expenses and monetary losses. On the other hand, the more intangible and subjective categories of damage were limited by Proposition 51 to a rule of strict proportionate liability." (2 Cal.4th at p. 600.)

In examining the rationale underlying Proposition 51, the court noted that it was intended to alter the "preexisting balance among the rights of employee, employer, and third party tortfeasor" so that the employee, "like any other tort victim," bears the risk of loss from noneconomic damages assessed against a defendant who is insolvent or immune. (*DaFonte* v. *Up Right, Inc., supra*, 2 Cal.4th at p. 603.) In a footnote, the court responded to arguments that third party suits by injured employees were not subject to Proposition 51 by stating that " 'the employer and third party should share liability as would ordinary concurrent tortfeasors.' " (2 Cal.4th at p. 604, fn. 6.) The court

further stated that the employer's fault should be allocated "as part of the total fault contributing to the employee's injury." (*Ibid.*) The court, however, stopped short of setting out a rule to cover the proper allocation of the workers' compensation benefit credit under Proposition 51, stating that the issue was not encompassed in its order granting review. (2 Cal.4th at pp. 604-605.) This summary of developments concerning the workers' compensation credit in third party cases brings us to the point at issue in the instant case.

*The Nature of Workers' Compensation Benefits*

The proper allocation of the workers' compensation credit after Proposition 51 depends upon the characterization of the benefits as economic or noneconomic damages. Respondent herein, in an argument that is superficially appealing, contends that all workers' compensation benefits are economic damages. Section 1431.2, subdivision (b)(1) defines economic damages as: "objectively verifiable monetary losses including medical expenses, loss of earnings, burial costs, loss of use of property, costs of repair or replacement, costs of obtaining substitute domestic services, loss of employment and loss of business or employment opportunities." Respondent refers to Labor Code sections 4453 (computation of earnings for temporary and permanent disability), 4454 (items included in earnings), and 4658 (permanent disability) and argues that these categories of benefit strongly resemble loss of earnings and loss of employment, which are clearly categorized as economic damages.[3] Because workers' compensation benefits are represented as monetary amounts, respondent assumes these benefits are "objectively verifiable monetary losses" under Proposition 51.

When we examine these benefits in slightly more depth, however, the similarity to economic damages in the tort context is greatly diminished. Although these benefits are paid in dollars, which may be verified, they encompass consideration of intangible, subjective items such as pain, and in some instances they impose penalties, which distinguishes them from the examples of economic damages stated in Proposition 51. For example, Labor Code section 4453, regarding computation of annual earnings for temporary and permanent disability, does not set out a method for determining actual wages lost to the employee, but consists of a series of statutory formulas that establish floors and ceilings for calculation of earnings. In section 4454, the

---

[3]Respondent also argues that a use note accompanying BAJI No. 16.75 states that the workers' compensation offset is for economic damages only. We have reviewed the instruction, and agree that the use note makes this statement. However, no authority is given to support the statement that workers' compensation benefits are economic damages, and we do not agree. We do agree with the portion of the statement which says that noneconomic damages are not affected by the employer's lien. The latter statement is mandated by Proposition 51. The former statement is not.

Labor Code specifies that "average weekly earnings within the limits [of] Section 4453" shall include overtime and other specified advantages received by the employee, but not sums paid by the employer for special employment expenses or the cost of savings plans or other benefit programs. Thus, the statute provides a formula for calculation of benefits based on some, but not all items of lost earnings. Therefore, this category of benefit is not the same as the tort concept of lost earnings, which is listed as an example of economic damage in Proposition 51. Labor Code section 4658, entitled "Permanent disability; Percentage of disability; Benefits schedule" consists of a series of tables, with "Range of percentage of permanent disability incurred" in one column, and "Number of weeks for which two-thirds of average weekly earnings allowed for each 1 percent of permanent disability within percentage range" in the other, which are used to calculate the permanent disability payment allowed pursuant to the statutory formula. The formula used in section 4658 establishes minimum and maximum amounts payable for permanent disability. An employee may receive permanent disability benefits even if he or she is not off work, and may even receive the benefits while working at the identical job held prior to the injury. (*Truck Ins. Exch.* v. *Industrial Acc. Com.* (1965) 235 Cal.App.2d 207 [45 Cal.Rptr. 178].) Subjective symptoms such as pain, may be the basis of permanent disability payments. (1 Hanna, Cal. Law of Employee Injuries and Workers' Compensation (rev. 2d ed. 1996) § 8.02[4][b], p. 8-11.) These factors indicate that intangible considerations rather than strictly objectively verifiable monetary losses support the payments made pursuant to the workers' compensation system.

Although the amount of payments actually made under the workers' compensation system may be objectively verifiable, the Labor Code provisions demonstrate that these benefits are not identical to compensation for monetary losses, nor are they direct reimbursement for items of medical expenses or lost earnings. Those items, as listed in Proposition 51, are dollar amounts that refer to actual out-of-pocket costs to totally compensate the injured person for economic expenses which were caused by the defendant. Workers' compensation benefits, even when they superficially resemble economic damages, are the product of a rough statutory approximation of what the average injury of a particular type should yield, rather than a precise computation of actual monetary losses.[4]

In addition to the different natures of workers' compensation benefits and economic damages, we note that the Labor Code includes provisions which

---

[4]Respondent erroneously contends that "special damages" are the same as "economic damages" and because Labor Code section 3856 refers to an employer's right to recover "special damages" from the third party judgment, the Labor Code itself recognizes that the employer's payments were economic damages. In fact, the Labor Code expressly defines "special damages" in the relevant context as amounts in addition to regular compensation,

are markedly punitive, including section 4554, which provides an increase in compensation by 10 percent where the employer willfully fails to pay compensation, and section 4555, which awards attorney's fees incurred in securing payment of compensation after a willful failure to pay. Labor Code sections 4551 and 4553 impose penalties when either employee or employer has been guilty of serious and willful misconduct. These provisions have been compared to the tort concepts "[denoting] an intention to perform an act or omission with actual knowledge" such as " 'wilful and wanton negligence,' 'wilful negligence,' 'wanton and wilful misconduct,' 'wanton and reckless misconduct,' 'wilful misconduct' all as used in tort actions . . . ." (*Hawaiian Pineapple Co.* v. *Ind. Acc. Com.* (1953) 40 Cal.2d 656, 662 [255 P.2d 431].) " 'Serious and willful misconduct' within the meaning of section 4553 is an act deliberately done for the express purpose of injuring another, or intentionally performed whether with knowledge that serious injury is a probable result or with a positive, active, wanton, reckless and absolute disregard of its possibly damaging consequences. [Citation.] 'In sum, the provisions of section 4553 were designed to penalize intentional misconduct of an employer . . . .' [Citation.]" (*Ferguson* v. *Workers' Comp. Appeals Bd.* (1995) 33 Cal.App.4th 1613, 1622 [39 Cal.Rptr.2d 806].)[5] Similarly, Labor Code section 5814 provides for a penalty equal to 10 percent of the award of benefits when payment of the benefits has been unreasonably delayed. "Section 5814 is the goad for securing timely payment of compensation to injured working men and women without delay. [Citation.]" (*Consani* v. *Workers' Comp. Appeals Bd.* (1991) 227 Cal.App.3d 12, 23 [277 Cal.Rptr. 619].) Although not technically punitive damages (33 Cal.App.4th at p. 1622), these provisions have little in common with the items referenced as economic damages in Proposition 51. We note that the nature of the benefits paid in the instant case is not ascertainable from the record on appeal, and may not include any of these more punitive items, but we discuss these parts of the Labor Code to assist in the analysis of the nature of workers' compensation benefits as a whole.

The difference in workers' compensation benefits and the economic damages defined in Proposition 51 stems from the fundamentally different nature of the workers' compensation system and the tort law system. The foundation of the workers' compensation system is the presumed compensation

including salary, wage, pension, or other emolument paid in lieu of or in addition to scheduled workers' compensation benefits. (Lab. Code, § 3852.) Rather than supporting respondent's argument, this provision of the Labor Code indicates that "special damages" and regularly scheduled compensation payments are different forms of employer payment.

[5]In fact, the provision that provides for the "serious and willful" penalty was enacted as a substitute for the previous right of an employee to bring a tort action for such intentional wrongdoing by the employer. (*Ferguson* v. *Workers' Comp. Appeals Bd., supra,* 33 Cal.App.4th 1613, 1620.)

bargain, wherein the employer assumes liability for industrial injury or death without regard to fault and the employee is afforded relatively quick payment of benefits.[6] In *Goldman* v. *Wilsey Foods, Inc.* (1989) 216 Cal.App.3d 1085, 1095 [265 Cal.Rptr. 294], the court explained the compromise nature of the workers' compensation system, stating that the: "California Constitution vested the Legislature with the plenary power to create a comprehensive workers' compensation system providing for a compulsory and exclusive scheme of employer liability without fault for employment-related injuries. This scheme . . . reflects a legislated 'quid pro quo.' Having balanced the sacrifices and gains of employers and employees, the Legislature created a workers' compensation scheme reflecting a 'fundamental social compromise,' in which employers accepted liability without fault to pay compensation to injured employees in exchange for exemption from employees' civil actions for damages. [Citation.]"

Although some items of workers' compensation benefits resemble economic damages, others do not. The system is a substitute for bringing an action against an employer, and the benefits paid are akin to a compromise payment made to avoid litigation. Therefore, rather than attempting to fit the different components of worker's compensation benefits into specified items of out-of-pocket or more subjective losses, we view the benefits as the proceeds of a settlement imposed by the Legislature for claims arising out of and occurring in the course of employment. " '[S]ettlement dollars are not the same as damages. Settlement dollars represent a contractual estimate of the value of the settling tortfeasor's liability and may be more or less than the proportionate share of the plaintiff[']s damages. The settlement includes not only damages, but also the value of avoiding the risk, expense, and adverse public exposure that accompany going to trial.' " (*Hoch* v. *Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, 67-68 [29 Cal.Rptr.2d 615].) Like settlement dollars, workers' compensation dollars are a product of a compromise, which include the same intangibles as do many other types of

---

[6]Respondent repeatedly characterizes the presumed compensation bargain as an agreement to give up any right to recover noneconomic damages from the employer in exchange for liability without proof of fault, and argues that unless 100 percent of the workers' compensation payments are deducted from economic damages, the worker will breach that theoretical agreement. Neither the Legislature nor the courts have characterized the compensation bargain as a surrender of noneconomic damages. What the employee gives up is the right to sue the employer for the broader range of damages available in tort. (*Privette* v. *Superior Court, supra,* 5 Cal.4th 689, 697; *Difko Admin. (U.S.) Inc.* v. *Superior Court* (1994) 24 Cal.App.4th 126, 133 [29 Cal.Rptr.2d 291].) It cannot be said that the Legislature has categorized workers' compensation benefits as either economic or noneconomic because prior to Proposition 51 it was unnecessary to analyze the nature of the payments made under the workers' compensation scheme. The wider range of damages available in a tort action includes actual compensation (as opposed to the statutory formulas in workers' compensation) for each item of economic, as well as noneconomic losses.

settlement. Because the workers' compensation system is a type of legislative compromise between the interests of injured employees and their employers, it is both fair and logical to view the benefits in the same manner as other settlement proceeds.

*Argument of Amicus Curiae*

Before we turn to a discussion of the cases concerning pre-verdict settlements under Proposition 51, we review the approach submitted by amicus curiae in the instant case. Amicus curiae advocates neither the *Espinoza* approach nor respondent's approach to calculating the third party's offset for workers' compensation payments. Amicus curiae argues that Proposition 51 has not changed the established method of computing the offset and advocates awarding appellant the lesser of: (1) the result after deduction of the amount of the workers' compensation payments from the total amount of damages; or (2) the full amount of the post-Proposition 51 judgment (100 percent of the economic damages plus the third party defendant's share of noneconomic damages). Amicus curiae argues that we should not attempt to allocate workers' compensation benefits between economic and noneconomic damages because the two groups of damages are not comparable. Under this approach, the verdict in the instant case would be the lesser of the following two calculations:

(1) $677,000.00 Total damages
 −162,008.53 workers' compensation payments
 $514,991.47 maximum possible verdict without a double recovery; or

(2) $274,000.00 economic damages
 +282,100.00 respondent's 70 percent share of noneconomic damages
 $556,100.00 basic Proposition 51 judgment

According to amicus curiae, the appropriate verdict would be number (1), above, because the Proposition 51 verdict exceeds the maximum, or "no double recovery" amount. Although we agree with amicus curiae that workers' compensation payments cannot be equated with economic damages, the Supreme Court in *DaFonte* v. *Up-Right, Inc., supra,* 2 Cal.4th 593, expressly stated that Proposition 51 was intended to alter the preexisting relationships among employers, employees and third parties so that the employer and third party now share liability like other concurrent tortfeasors. (2 Cal.4th at pp. 603-604, fn. 6.) In light of this statement by the Supreme Court, we deem it appropriate to attempt to allocate the workers' compensation payments in some principled fashion, rather than to choose between a pre-Proposition 51 calculation and a calculation with no deduction for the workers' compensation payments.

*Allocation of Workers' Compensation Credits as Settlement Proceeds*

 The allocation of pre-verdict settlement proceeds under Proposition 51 was described in *Espinoza* v. *Machonga, supra,* 9 Cal.App.4th 268.[7] The plaintiff in *Espinoza* brought an action against individual defendants and a county housing authority for injuries received when a glass door shattered and injured his eye. The housing authority settled before trial for $5,000. The issue on appeal was how the settlement affected the liability of a remaining nonsettling defendant. The court noted that after Proposition 51, a defendant is "no longer liable for any amount of the plaintiff's noneconomic damages which exceeds the percentage of those noneconomic damages attributable to that defendant." (9 Cal.App.4th at p. 272.) The court rejected the defendant's suggestion that the entire $5,000 settlement should be deducted from the total verdict, as reduced for plaintiff's negligence and defendant's share of the noneconomic damages. The court noted that this method would effectively allocate 88.99 percent of the economic damages to the settlement, even though the housing authority and Machonga were equally at fault. (*Id.* at p. 274.)

Recognizing that the relevant statute required that a release given in good faith shall reduce the claims against the other tortfeasors in the amount stipulated or the amount paid for the release, the court found that Proposition 51 had changed the meaning of a "claim" against the others. Thus, "a personal injury plaintiff's valid 'claim' against one such tortfeasor for noneconomic damages can never be the liability of 'the others.' [Citation.] The payment of such a claim by one tortfeasor is not the payment of a claim for which 'the others' might ever be held jointly and severally liable." (*Espinoza* v. *Machonga, supra,* 9 Cal.App.4th at pp. 274-275.) Once the court determined that a defendant may only be held liable for that defendant's proportionate share of the noneconomic damages, it was clear that the remaining defendants were entitled to no credit for the noneconomic portion of the settling defendant's contribution to the plaintiff's recovery. (*Id.* at p. 275.)[8] "To do otherwise would, in effect, cause money paid in settlement to be treated as if it was paid as a joint liability." (*Id.* at pp. 276-277.)

---

[7]For a discussion of the application of *Espinoza* in the workers' compensation context, and a proposal for another method of calculating the credit, see Peyrat, *Calculating Judgments Under Proposition 51: Effect of Plaintiff's Fault, Settlements, and Workers' Compensation* (Cont.Ed.Bar 1993) 15 Civ. Litigation Rep. 88.

[8]The court explained that plaintiffs, in general, have the greatest interest in allocating as little as possible to economic damages, since all nonsettling defendants remain jointly and severally liable for those damages. Nonsettling defendants would want to allocate as much as possible to economic damages to reduce their liability. The settling defendant would have no real preference, which would raise a possibility of unfairness if the settling parties were allowed to enter into a binding allocation of economic and noneconomic damages. (*Espinoza*

The court then considered possible methods by which the parties or the court could determine which portion of the settlement constituted economic damages, including express allocations, and a good faith *Tech-Bilt* estimate. (*Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488 [213 Cal.Rptr. 256, 698 P.2d 159].) Since neither of those possibilities had occurred in that case, the court determined that the undifferentiated settlement should be viewed as a whole, and the percentage attributable to economic damages should be calculated in relation to the entire award. Therefore, the court looked to the relationship of the jury's award of economic damages to the total verdict and determined that the economic portion of the settlement proceeds should bear the same ratio to the total settlement as the jury had determined the economic damages bore to the total judgment. The *Espinoza* approach has been followed in several cases, including cases from this court and from other states. (*Greathouse* v. *Amcord, Inc., supra,* 35 Cal.App.4th 831, 838; *Poire* v. *C.L. Peck/Jones Brothers Construction Corp.* (1995) 39 Cal.App.4th 1832, 1841 [46 Cal.Rptr.2d 631] [approved *Espinoza* for settlement proceeds, did not reach issue of worker's compensation]; *Hoch* v. *Allied-Signal, Inc., supra,* 24 Cal.App.4th 48, 63; *Conrad* v. *Ball Corp.* (1994) 24 Cal.App.4th 439, 443-444 [29 Cal.Rptr.2d 441]; *In re Piper Aircraft* (N.D.Cal 1992) 792 F.Supp. 1189, 1192-1193 [no offset against noneconomic damages]; *Wells* v. *Tallahassee Mem. Med. Center* (Fla. 1995) 659 So.2d 249; *Neil* v. *Kavena* (1993) 176 Ariz. 93 [859 P.2d 203] [no offset for settlement where liability is several].)

We note that two cases have touched upon the appropriate allocation of the workers' compensation benefit credit and have indicated that a deduction from economic damages would be appropriate. The court in *Hernandez* v. *Badger Construction Equipment Co.* (1994) 28 Cal.App.4th 1791 [34 Cal.Rptr.2d 732], a case arising under the federal Longshore and Harbor Workers' Compensation Act, approved a trial court's deduction of the workers' compensation benefits from economic damage, but did not discuss the point or indicate that any alternative allocation had been considered. (28 Cal.App.4th at p. 1810.) In *Poire* v. *C.L. Peck/Jones Brothers Construction Corp., supra,* 39 Cal.App.4th 1832, the full amount of the workers' compensation benefits was deducted from economic damages, but the propriety of that allocation was not at issue in the case. (*Id.* at p. 1837.)[9]

As explained by the court in *Hoch* v. *Allied-Signal, Inc., supra,* 24 Cal.App.4th 48, a personal injury defendant is liable for his or her share of

v. *Machonga, supra,* 9 Cal.App.4th at pp. 275-276; *Greathouse* v. *Amcord, Inc.* (1995) 35 Cal.App.4th 831, 841 [41 Cal.Rptr.2d 561] [noting that a settlement agreement allocating percentages of economic damages is "inherently suspect."].)

[9]*Engle* v. *Endlich* (1992) 9 Cal.App.4th 1152 [12 Cal.Rptr.2d 145], which discussed the appropriate reduction of an award for workers' compensation benefits, expressly determined that Proposition 51 did not apply to the case. (9 Cal.App.4th at pp. 1168-1169.)

the noneconomic damages without regard to the liability of any other defendant. An unusual circumstance of the *Hoch* case was that plaintiffs made no claim of economic loss and the entire verdict was noneconomic damages. In the absence of joint and several liability, the court applied the *Espinoza* formula to deny any deduction for pretrial settlements. Noting that the purpose of Proposition 51 was to hold defendants liable "in closer proportion to their degree of fault," the court found that the defendant was held liable in exactly that amount. Examining the policy implications of its holding, the court noted that this formula was fair to plaintiffs and conducive to settlements because it did not require plaintiffs "to bear the risk of divergence between the settlement and the jury's assessment of the settling party's liability, without allowing plaintiffs to reap the potential benefit of such divergence." (24 Cal.App.4th at p. 64.)

Regarding the contention that the *Espinoza* approach may allow a plaintiff a double recovery, the *Hoch* court first noted that a nonsettling defendant is required to pay his or her portion of the noneconomic damages despite a settlement that was higher than the verdict. " ' ". . . Plaintiffs bear the risk of poor settlements; logic and equity dictate that the benefit of good settlements should also be theirs." ' [Citations.]" (*Hoch* v. *Allied-Signal, Inc.*, *supra*, 24 Cal.App.4th 48, 66.) A second point made regarding the policy prohibiting double recovery was that it is "inextricably linked to the joint liability of multiple tortfeasors." (*Id.* at p. 67.) Thus, when all liability was joint, a setoff for payments from other defendants was needed to prevent a plaintiff from recovering from the other defendants more than the damages necessary to fully compensate him for the injury, because it was assumed that a settlement was intended to cover the entire harm caused. However, the *Hoch* court explained: "[t]hat assumption loses its force under a scheme of several liability allocated by fault. '[T]he one recovery rule was originally adopted because the courts could not conceive of allocating liability. Injuries were considered indivisible; therefore, a settling defendant could only offer to pay for the whole injury, not just his part. . . .' [Citation.]" (*Ibid.*)[10] Thus, although application of *Espinoza* to the instant case involves no "double recovery," we would not find the abstract possibility that a plaintiff

---

[10]"The law contains no rigid rule against overcompensation. Several doctrines, such as the collateral benefits rule, recognize that making tortfeasors pay for the damage they cause can be more important than preventing overcompensation." (*McDermott, Inc.* v. *AmClyde* (1994) 511 U.S. 202, 219 [128 L.Ed.2d 148, 162-163, 114 S.Ct. 1461, 1470-1471], fn. omitted.)

may recover more in settlement than in the eventual verdict to be a reason not to follow *Espinoza*.[11]

Applying *Espinoza* to the instant case results in the following calculations:

| | |
|---|---|
| $677,000.00 | total damages |
| 274,000.00 | economic damages awarded by jury (40.473 percent of total damages) |
| −65,569.71 | (40.473 percent of workers' compensation payment of $162,008.53) |
| $208,430.29 | joint and several judgment for economic damages |
| +282,100.00 | several judgment for Performance's 70 percent share of noneconomic damages |
| $490,530.29 | Performance's total liability to Scalice. |

Under this formula, respondent pays no more than its 70 percent share of the noneconomic damages, which satisfies the provisions of Proposition 51, and appellant receives no double recovery.

Respondent argues that using the *Espinoza* calculation in this fashion would result in a windfall to an employee in a complicated hypothetical which contrasts the instant case (employer 30 percent negligent and entitled to no reimbursement, employee recovers net judgment of $490,530.29) to a case in which the employer is not negligent, recovers its entire lien, and one of two joint tortfeasors is 30 percent negligent and insolvent). Respondent's calculations show the plaintiff receiving a larger net judgment in the second scenario. The flaw in respondent's calculation is the assumption that a nonnegligent employer would be reimbursed entirely from economic damages. This is not the case, because the employer's reimbursement payment is deducted from the entire judgment.

In *Heaton* v. *Kerlan* (1946) 27 Cal.2d 716 [166 P.2d 857], the Supreme Court acknowledged that courts had previously required segregation of

---

[11]Just as we have rejected respondent's contention that the deduction should be made solely from economic damages, we reject appellant's suggestion that it be taken solely from noneconomic damages. Appellant's point, that the court deducted the workers' compensation benefits from economic damages, then made a second deduction by subtracting the employer's 30 percent share of negligence from noneconomic damages is not accurate. Performance is liable for its 70 percent share of noneconomic damages because of the jury's verdict, not because the court made a second deduction. Appellant's formula ignores the intent of Proposition 51 to alter the balance in third party actions by making the employee, like any other plaintiff, bear the risk of loss from noneconomic damages attributable to a defendant who is insolvent or immune. (*DaFonte* v. *Up-Right, Inc.*, *supra*, 2 Cal.4th 593, 603.) By attempting to reach a fair allocation of the economic and noneconomic portions of the employer's payment, we bring computation of the workers' compensation offset into alignment with the computation of offsets for other amounts received by tort plaintiffs prior to the verdict.

damages and awarded the employee damages for pain and suffering free of the employer's lien. When the Legislature amended the Labor Code, the court stated: "The employer's lien attaches to the 'entire amount' of a judgment 'for any damages.' (Lab. Code, § 3856.) The Legislature so defined the lien (Stats. 1931, p. 2370. Deering's Gen. Laws, 1931, Act 4749) after this court held that the lien of the employer under the former statute did not attach to that part of a judgment representing damages for the employee's pain and suffering, and suggested that the difficulties of segregating the elements of the employee's recovery 'might well call for further legislative action on the subject.' [Citation.] Under the statute as amended, it is clear that the employer's lien attaches to the entire judgment and that it is no longer necessary to segregate the part thereof that represents damages for pain and suffering. [Citation.]" (*Heaton* v. *Kerlan, supra,* 27 Cal.2d 716, 723.)[12] Proposition 51 has no impact on the calculation and deduction of the employer's lien claim. Respondent's claim of unfairness in the application of *Espinoza* is not supported by its hypothetical calculations.

Contrary to the argument that a deduction for Safeway's 30 percent responsibility for negligence already has been taken from noneconomic damages, respondent's noneconomic damages were set by the jury, and are unrelated to any further deductions. As pointed out in the *Hoch* case, respondent is entitled to no deductions from noneconomic damages, since those damages represent its full share of responsibility, and would not change under any theory. (*Hoch* v. *Allied-Signal, Inc., supra,* 24 Cal.App.4th 48, 67-68.) The *Espinoza* calculation applied to the instant case merely increases (over the trial court's calculation) the amount of economic damages for which respondent is jointly and severally liable. We conclude that the trial court erred in its allocation of the workers' compensation benefits.

*Improper Entry of Nunc Pro Tunc Judgment*

 Although appellant lists this point as an issue on appeal, he presents no legal argument in support of the point, and merely asks for interest on the judgment from the date of entry of the verdict on August 4, 1995. We note that the judgment was entered after the parties were allowed to brief and argue the appropriate deductions from the verdict. Until this decision was rendered, the court was unable to enter the verdict, since it did not know the amount. "[R]etroactive entry [of a judgment] is an exercise of *inherent*

---

[12]Labor Code section 3856 no longer contains the language "entire amount" and "for any damages," however, it now states that the employer's lien is deducted, after expenses and attorneys' fees, from "any judgment for damages recovered . . . ." The meaning, for purposes of this discussion, is unchanged from the 1931 version of the statute.

*power* of the court, the object being to do justice to a litigant whose rights are threatened by a delay which is not his fault." (7 Witkin, Cal. Procedure (3d ed. 1985) Judgment, § 62, pp. 496-497.) The only appropriate reason for the exercise of this power is to preserve the rights of a party that would otherwise be lost. Entry of judgment nunc pro tunc is intended to " 'express the true intention of the court as of the earlier date and thus conform to verity.' " (*Id.* at § 63, p. 497.)

The jury rendered its verdict on August 4, 1995. The parties were not in agreement as to how to offset the workers' compensation benefits, and were given time to brief the issue. Judgment in the instant case was actually rendered on September 27, 1995. At that time, the court noted that it would normally have taken until September 1 to brief, argue, and analyze the difficult issue raised by Proposition 51 and its application to the workers' compensation benefits. The record on appeal indicates that the delay between that date and September 27 was due to the court's unavailability. Therefore, to protect appellant from events beyond his control, the court entered judgment as of the earlier date. We find no abuse of the court's discretion in entering the order as of the date that it would have actually made its determination, but for the delay which was not attributable to appellant.

CONCLUSION

The judgment is modified to award the amount of $490,530.29 against Performance and in favor of Scalice, as calculated above. As amended, the judgment is affirmed. Appellant is entitled to costs on appeal.

Stein, Acting P. J., and Swager, J., concurred.

On November 15, 1996, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied December 18, 1996. Chin, J., and Brown, J., were of the opinion that the petition should be granted.