MAXLYN CADLO, Plaintiff and Respondent, v.
METALCLAD INSULATION CORPORATION, Defendant and Appellant.

[No. A112002. First Dist., Div. Five. June 11, 2007.]

MAXLYN CADLO, Plaintiff and Respondent, v.
JOHN CRANE INC., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105 and 8.1110, parts I.A.3., I.A.4., I.B., II. and III. of this opinion are not certified for publication.

## COUNSEL

McKenna Long & Aldridge, Lisa L. Oberg, Camille K. Fong and Mabi H. Ellis for Defendant and Appellant Metalclad Insulation Corporation.

Hassard Bonnington, Philip S. Ward, John P. Katerndahl and Richard G. Katerndahl for Defendant and Appellant John Crane Inc.

Brayton Purcell, Alan R. Brayton, Lloyd F. LeRoy and David Collins for Plaintiff and Respondent.

## OPINION

**SIMONS, J.**—Two days after a jury verdict in his favor in his asbestos-related personal injury action against defendants Metalclad Insulation Corporation (Metalclad) and John Crane Inc. (Crane),[1] Anthony Cadlo (Cadlo) died. Judgment was entered on April 4, 2005, more than one week after his death, on behalf of his widow Maxlyn Cadlo (Maxlyn Cadlo), individually and as successor in interest to her husband.[2] Subsequently, the trial court vacated that judgment and, nunc pro tunc, entered a retroactive judgment to March 23, 2005, the day after the verdict and one day before Cadlo died. In that judgment, the court award included damages for future economic loss and for pain and suffering. Defendants appeal that judgment.[3]

---

[1] Metalclad and Crane are referred to collectively as defendants.

[2] Cadlo and Maxlyn Cadlo are referred to collectively as plaintiffs.

[3] On our own motion and by an order separately filed, we have consolidated the two appeals.

They each challenge the inclusion of these damages as contrary to Code of Civil Procedure section 377.34. They also argue that expert witness fees and prejudgment interest should not have been awarded. In addition, Metalclad contends insufficient evidence was presented that Cadlo was exposed to Metalclad's asbestos-containing materials, and Crane contends the court committed instructional error and erred in allocating pretrial settlements to Maxlyn Cadlo's loss of consortium claim. In the published portion of this opinion we reject the attack on the future and noneconomic damages. In the unpublished portion, we reject defendants' remaining contentions.

### BACKGROUND

#### *Cadlo's Testimony*

Cadlo, born in 1944, served in the United States Navy on board the USS Black as a machinist's mate from January 1965 until his June 1968 discharge. During that service, Cadlo was involved in the removal of asbestos-containing pipe insulation and valve insulation pads. On one occasion, between 1965 and 1968, the USS Black was drydocked for two and one-half months at the Long Beach Naval Shipyard (LBNS) for a major overhaul, including the removal of old asbestos insulation. During this overhaul, shipyard insulators tore out and replaced insulation. Cadlo said that when the workers used saws to cut the lagging off piping and equipment it "look[ed] like a snowstorm."

On two other occasions, the USS Black was at the LBNS for about a week. No major repairs or work was performed on these occasions. Cadlo was also assigned to the ship's engine room during a shorter overhaul, which included insulation removal, at a naval shipyard in Sasebo, Japan. Cadlo could not remember the names of any of the manufacturers or suppliers of the packing, gasket and thermal insulation materials he worked around on the USS Black.

Cadlo also testified that while on board the USS Black he worked on valves and pumps, which involved removal of valve and pump packing and insulation. In his responses to requests for admission, he stated that he worked with Crane's products during his Navy service. Crane manufactured and supplied asbestos-containing pump and valve packing material and gasket material, and concedes that Cadlo was exposed to its asbestos-containing products.

*Ay's Testimony*

Charles Ay served as an "asbestos worker insulator" at the LBNS between April 1960 and September 1981, and worked aboard ships installing insulation materials and performing pipefitting work. As an insulator he worked with all of the thermal insulation materials used at the LBNS. The materials containing asbestos included pipe insulation, block insulation, insulating mud, and cloth. On multiple occasions in the 1960's, Ay worked on the USS Black when it was at the LBNS, including when it was there for an overhaul in the mid-1960's. In 1965, Ay spent 80 percent of his time on ship and 20 percent off ship.

During the 1960's, the General Services Administration (GSA) had contracts with various companies to supply insulation materials to the LBNS upon request. The GSA was the largest supplier of insulation material to the LBNS, and this product originated from Pabco, Owens Corning, Johns-Manville, Armstrong, GAF Rubberoid, and Philip Carey. Outside vendors also supplied insulation materials to the LBNS. These outside vendors, also referred to as contractor-suppliers, were Metalclad, Thorpe Insulation (Thorpe), Fenco, and Armstrong Contracting and Supply (ACandS). Metalclad supplied Pabco and Kaylo, Thorpe supplied Johns-Manville, and Fenco and ACandS supplied Kaylo. Daily, Ay would see the outside vendors' trucks in the shipyard dumping material. Two or three times a week Metalclad would deliver its material in pickup trucks and "box trucks" to two LBNS storage buildings or a ship pier. Metalclad and Thorpe supplied pipe covering, block, cloth, and mud. In the early and mid-1960's, Metalclad supplied Pabco and Kaylo insulation and Pabco mud to the LBNS. Based on observing trucks coming into the LBNS, Ay said that Thorpe was the largest outside vendor of insulation materials to the LBNS, followed by Metalclad. Fenco and ACandS were each "very small" suppliers. The insulation materials from the various vendors were "completely interchangeable" and placed in a common supply warehouse.

Ay did not know how much insulation supplied to the LBNS in 1960, 1965, and 1967 came from Metalclad. But he said Metalclad was there "continuously to deliver a voluminous amount of material," to be used on a daily basis. Ay also did not know how much insulation either by quantity or percentage was supplied by Metalclad, Thorpe, Fenco or ACandS to the LBNS in the 1960's. Ay never saw a Metalclad truck unload any material

onto the USS Black or any other ship and did not recall seeing Metalclad products used aboard the USS Black or any specific ship.

Ay testified that the GSA insulation materials were almost always delivered to the LBNS by railroad boxcars. The material would be offloaded onto pallets that were taken by forklift to the warehouse. Annually, the GSA delivered more insulation material to the LBNS than did Metalclad. Ay did not know if Metalclad supplied insulation materials to the GSA.

Ay said that, in the 1960's, Metalclad supplied asbestos insulation to and performed insulation contract work on ships at the LBNS, but Thorpe, Fenco, and ACandS did not.

### Borkowski's Testimony

Allen Borkowski's deposition testimony established that he served on board the USS Black between 1964 and 1967, and recalled installing Kaylo brand pipe covering and block insulation on that ship on approximately six or eight occasions.

### Trueblood's Testimony

Metalclad employee Donald Trueblood testified that between 1933 and 1973 Metalclad was involved in the installation and sale of asbestos-containing insulation materials. In late 1967, Metalclad began selling Pabco brand calcium silicate insulation. Prior to that time, Metalclad sold Kaylo brand insulation.

### The Verdict

In its special verdict, the jury found that defendants were negligent, defendants' asbestos-containing products were defective in design, defendants failed to provide adequate warnings for their products and defendants' negligence, design defects, and failure to warn were legal causes of Cadlo's injury. It also found in favor of Maxlyn Cadlo on her loss of consortium claim. It awarded Cadlo $87,304.74 in past medical expenses, $174,000 in

future medical expenses, $1,412,400 in nonmedical economic damages, and $4 million in noneconomic damages. It awarded Maxlyn Cadlo $3 million in loss of consortium damages. The jury apportioned 3 percent of fault for plaintiffs' injuries to Crane and 4 percent of fault to Metalclad.

I. *Joint Issues in the Two Appeals*

A. *The Damages Awarded in the Judgment Were Proper*

On March 22, 2005, the jury rendered its verdict in favor of plaintiffs, and the court ordered plaintiffs' counsel to prepare and submit an agreed form of judgment. Cadlo died on March 24, but plaintiffs' counsel was not informed of the death until several days later. On March 25, the court signed an interim judgment.[4] The court entered the judgment on special verdict on April 4, 2005. The judgment stated, in relevant part: "The economic damages set forth above will be reduced by offsets for prior settlements and other payments or credits allowed by law, if any. Said reductions as well as plaintiffs' entitlement to ordinary and expert costs and prejudgment interest, if any, shall be determined by the court in subsequent proceedings."

On June 7, 2005, Maxlyn Cadlo filed a declaration pursuant to Code of Civil Procedure section 377.32[5] to permit her to continue and/or commence any and all actions related to Cadlo's asbestos exposure that survive his death.

On July 20, 2005, Maxlyn Cadlo filed a motion "for an order determining the application of Proposition 51 [(Civ. Code, § 1431.2)] and allocation of pretrial settlements so as to finalize judgment in this matter."

On July 28, 2005, Metalclad filed a motion pursuant to section 663[6] to partially vacate the judgment and enter a different judgment. Metalclad relied on section 377.34 to argue that because Cadlo had died before the April 4 entry of judgment, the judgment improperly included an award to Cadlo of $4 million in noneconomic damages, $174,000 in future medical damages, and future economic damages[7] that must be stricken from the judgment.[8]

---

[4] The March 25, *2004* handwritten date on the judgment appears to be merely a clerical error since the judgment expressly states that trial commenced on January 20, 2005.

[5] All undesignated section references are to the Code of Civil Procedure.

[6] Pursuant to section 663, a trial court retains jurisdiction to consider and grant a motion to vacate a judgment and enter a different judgment to correct an incorrect or erroneous legal basis for decision, not consistent with or supported by the facts, or a judgment not consistent with or not supported by the special verdict. (*Craven v. Crout* (1985) 163 Cal.App.3d 779, 782–783 [209 Cal.Rptr. 649].)

[7] Metalclad noted that the jury awarded Cadlo $1,412,400 in economic damages without specifying what portion accounted for past economic damages and what portion accounted for future economic damages.

[8] Metalclad also opposed Maxlyn Cadlo's motion regarding application of Proposition 51 and allocation of pretrial settlements, arguing, in part, that given the dispute as to whether

On August 12, 2005, Maxlyn Cadlo filed a motion to vacate the prior judgment and enter a new antedated judgment nunc pro tunc to March 22, pursuant to section 664 "so as to ensure that plaintiffs retain 'the legitimate fruits' of this litigation and avoid a patent injustice." Both defendants opposed this motion.

On September 6, 2005, the court granted Maxlyn Cadlo's motion to vacate the prior judgment and entered a new antedated judgment nunc pro tunc to March 23, 2005.

On September 19, 2005, the court granted Maxlyn Cadlo's motion regarding application of Proposition 51 and allocation of pretrial settlements. The court ruled that after offsets against economic damages, the net economic damage award was $1,362,842.11, for which Metalclad and Crane were jointly and severally liable. The order stated that the court would "retain continuing jurisdiction to ensure defendants receive a similar offset from any future settlement monies received in satisfaction of this . . . action" and "[t]his order is hereby made part of and incorporated in the judgment that was entered nunc pro tunc by this court on September 6, 2005."

On appeal Metalclad and Crane contend the court erred in awarding Maxlyn Cadlo damages for future economic loss and for pain and suffering since Cadlo died before entry of the original judgment. Resolution of this issue requires an evaluation of the interaction of sections 377.34, 664, and 669.

## 1. The Legal Framework

### (a) The Relevant Statutes

Section 377.34 provides: "In an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement." Though worded in the affirmative, this section effectively imposes a limit on the types of recoverable damages when the plaintiff dies before judgment. (*Sullivan v. Delta Air Lines, Inc.* (1997) 15 Cal.4th 288, 298–303 [63 Cal.Rptr.2d 74, 935 P.2d 781] (*Sullivan*).)

---

Cadlo was entitled to recover future and noneconomic damages, it was premature to calculate the offset ratio. Metalclad and Crane also challenged the motion on the merits.

Section 664 provides in relevant part: "When trial by jury has been had, judgment must be entered by the clerk, in conformity to the verdict within 24 hours after the rendition of the verdict, whether or not a motion for judgment notwithstanding the verdict be pending, unless the court order the case to be reserved for argument or further consideration, or grant a stay of proceedings."

Section 669 provides in relevant part: "If a party dies after . . . a verdict upon any issue of fact, and before judgment, the court may nevertheless render judgment thereon."

Section 664 is directory rather than mandatory (*Churchill v. Louie* (1902) 135 Cal. 608, 612 [67 P. 1052]; *Shapiro v. Equitable Life Assur. Soc.* (1946) 76 Cal.App.2d 75, 99 [172 P.2d 725]); and, pursuant to sections 664 and 669, the court could properly enter a judgment though Cadlo had died. The parties differ on the applicability of section 377.34, and whether its limitation on damages prevails over the court's inherent power to enter an amended antedated judgment nunc pro tunc to a date prior to that death. Metalclad and Crane rely on two cases to argue that the amended judgment was improperly entered because section 377.34 creates a bright-line rule that barred the trial court from awarding the challenged damages: *Williamson v. Plant Insulation Co.* (1994) 23 Cal.App.4th 1406 [28 Cal.Rptr.2d 751] (*Williamson*) and *Kellogg v. Asbestos Corp. Ltd.* (1996) 41 Cal.App.4th 1397 [49 Cal.Rptr.2d 256] (*Kellogg*). An examination of these cases and *Sullivan* leads us to the opposite conclusion.

(b)  Williamson

In *Williamson*, in the first phase of a bifurcated jury trial conducted in 1991, the jury found that asbestos exposure was a legal cause of the plaintiff's loss, and he was entitled to economic and noneconomic damages. (*Williamson, supra*, 23 Cal.App.4th at p. 1412.) The plaintiff died during the second phase, where liability and comparative fault were tried; but, the trial continued and the jury found the defendant liable. The trial court entered judgment nunc pro tunc as of the day before the plaintiff's death and included noneconomic damages in the judgment. (*Id.* at pp. 1412–1413.)

Division Three of this court reversed, concluding that, in 1991, neither the common law power to enter judgments nunc pro tunc nor section 669 permitted the trial court to enter the antedated judgment. (*Williamson, supra*, 23 Cal.App.4th at pp. 1414–1415.) The court reasoned that at the time of the plaintiff's death the case was not ready for rendition of judgment since the evidentiary stage of the trial had not been completed, the jury had not been instructed, the attorneys had not argued and there was no verdict upon which

judgment could be entered. (*Id.* at pp. 1415–1416.) Because the trial court had no authority to enter the antedated judgment, Probate Code former section 573, subdivision (c) (hereafter Probate Code former section 573(c)) barred recovery of the noneconomic damages awarded by the jury.[9] (*Williamson*, at p. 1414.)

Recognizing that Probate Code former section 573(c) could appear arbitrary,[10] *Williamson* stated, "a line must be drawn if [Probate Code former] section 573(c) is to have any effect at all, and in that section, the Legislature drew a clear line: noneconomic damages do not survive if the plaintiff dies before judgment. The cases on nunc pro tunc entry of judgment push that line back a short distance, to the time when judgment *could* have been rendered even if it was not. That movement rests on a sound rationale—that a party should not suffer from the court's own delay in giving judgment—and it would be neither wise nor within our authority to erase the line thus drawn." (*Williamson, supra*, 23 Cal.App.4th at p. 1417, fn. omitted.) The court reversed the award of noneconomic damages to the plaintiff's estate.[11]

(c) Kellogg

In *Kellogg*, testimony was completed in a bench trial after which the parties argued and the matter was submitted " 'subject to [further] argument.' " (*Kellogg, supra*, 41 Cal.App.4th at pp. 1401–1402.) Approximately two weeks later the parties argued and the matter was finally submitted. Five days later, on August 14, 1988, the plaintiff died. On April 6, 1990, judgment in favor of the plaintiff was entered, which included an award of damages for the plaintiff's pain and suffering. (*Id.* at p. 1402.) On appeal, the defendant, in reliance on Probate Code former section 573(c), argued that since the plaintiff died before final judgment, the judgment could not include an award of damages for the plaintiff's pain and suffering. In reliance on Code of Civil Procedure section 669, the plaintiffs argued the damages were properly awarded. (*Kellogg*, at p. 1404.)

---

[9] In 1991, Probate Code former section 573(c) provided: "Where a person having a cause of action dies before judgment, the damages recoverable by his or her personal representative are limited to the loss or damage the decedent sustained or incurred prior to death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived but not including any damages for pain, suffering, or disfigurement." (Stats. 1987, ch. 923, § 35.5, p. 2982, eff. July 1, 1988.)

[10] The court recognized that such arbitrariness could be advantageous to a plaintiff who received a large pain and suffering award and died the day after entry of judgment. In that instance, the award is passed on to the plaintiff's estate even though the estate did not endure the pain and suffering. (*Williamson, supra*, 23 Cal.App.4th at p. 1417, fn. 3.)

[11] Since the record in *Williamson* did not reveal the amount, if any, the jury awarded for future economic damages, or what portion of damages was suffered before the plaintiff's death, the Court of Appeal reversed the award of economic damages and remanded for trial thereon.

Division Four of this court held that pursuant to section 669, the trial court properly rendered judgment because the plaintiff died after trial and submission of the case. (*Kellogg, supra,* 41 Cal.App.4th at p. 1404.) However, the plaintiff's death occurred before that judgment was rendered; and, at no time did the *Kellogg* plaintiffs request the trial court to exercise its authority to issue a judgment nunc pro tunc. (*Id.* at pp. 1405, 1406, fn. 8.) *Kellogg* held that since the plaintiff died before judgment, Probate Code former section 573(c) prohibited the trial court from awarding noneconomic damages for the plaintiff's pain and suffering. (*Kellogg,* at p. 1407.)[12]

(d)   Sullivan

In *Sullivan,* the plaintiff had been awarded a judgment for money damages that included pain and suffering, but the plaintiff died during the pendency of the appeal. The court concluded the damages limitation of Code of Civil Procedure section 377.34 did not apply in this context. (*Sullivan, supra,* 15 Cal.4th at pp. 291–292.) Its analysis rested, in part, on section 377.34's predecessor statute, Probate Code former section 573(c), that had imposed the identical damages limitation " '[w]here a person having a cause of action dies before judgment.' " (*Sullivan,* at p. 302.) Because the California Law Revision Commission, which drafted section 377.34, explained that " 'Section 377.34 restates former Probate Code Section 573(c) *without substantive change*' " (*Sullivan,* at p. 301), the Supreme Court interpreted section 377.34 to apply "only when the person entitled to maintain the action died 'before judgment' " (*Sullivan,* at p. 303). The court then construed the phrase "before judgment" to mean "before rendition of a judgment that is final in the fundamental sense that it leaves no issue to be determined between the parties except the fact of compliance." (*Id.* at pp. 304–305.) "Finality in this sense not only makes a judicial determination a judgment, it also makes that judgment appealable." (*Id.* at p. 304.)

2.   *Section 377.34 Does Not Limit Damages in This Matter*

As explained in *Sullivan,* section 377.34 prohibits the recovery of certain damages in an action brought or maintained on behalf of a plaintiff who dies before judgment. (*Sullivan, supra,* 15 Cal.4th at pp. 291–292.) Metalclad contends that even if the court was authorized to enter the antedated judgment, section 377.34 imposed a limitation on the types of damages awardable. We disagree. When a court *validly* exercises its discretion to issue a judgment nunc pro tunc, the date of *that* judgment determines

---

[12] The entire damage award was reversed because based on the record before it, the Court of Appeal could not determine the amount of economic damages awarded and what amount, if any was awarded for future economic losses. (*Kellogg, supra,* 41 Cal.App.4th at pp. 1407–1408.)

whether section 377.34 bars recovery. A contrary result would be illogical. The authority to issue such a judgment is rooted in the goal of avoiding injustice (*Williamson, supra,* 23 Cal.App.4th at p. 1415, & cases cited therein), and, if properly exercised, creates the only judgment in the proceeding that could test the applicability of section 377.34. Moreover, nothing in *Williamson* and *Kellogg* undermines this conclusion.

In *Kellogg,* the plaintiffs never sought and the court never issued a judgment retroactive to a date prior to the plaintiff's death. (*Kellogg, supra,* 41 Cal.App.4th at p. 1406, fn. 8.) Thus, the only judgment rendered by the trial court *followed* the plaintiff's demise, and the damages limitation of section 377.34 applied. In *Williamson,* the trial court did issue a retroactive judgment to a date prior to the plaintiff's death, but the appellate court concluded there was no authority to do so. (*Williamson, supra,* 23 Cal.App.4th at pp. 1415–1416.) As in *Kellogg,* the only valid judgment in *Williamson* followed the decedent's demise and section 377.34 applied.

■ Finally, dictum in *Williamson* confirms that entry of a valid nunc pro tunc judgment to a date prior to a claimant's death is immune to the damages limitation in Code of Civil Procedure section 377.34. *Williamson* explained that the predecessor statute, Probate Code former section 573(c), "drew a clear line: noneconomic damages do not survive if the plaintiff dies before judgment." (*Williamson, supra,* 23 Cal.App.4th at p. 1417, fn. omitted.) However, *Williamson* continued, "The cases on nunc pro tunc entry of judgment push that line back a short distance, to the time when judgment *could* have been rendered even if it was not." (*Ibid.*) Thus, *Williamson* assumed that a valid, nunc pro tunc backdating of a judgment would preserve a plaintiff's claims for damages against the damages limitation now contained in section 377.34.

Crane next relies on *Sullivan* to argue that the court abused its discretion because, at the time Cadlo died, certain posttrial motions remained unresolved. Since no judgment could have been entered, the argument runs, *Williamson* requires us to reverse. Crane is wrong.

Certainly, the court may not rely on either section 669 or the court's common law power to issue nunc pro tunc judgments to antedate a judgment to a date before the judgment could validly have been entered. (*Williamson,* 23 Cal.App.4th at pp. 1414–1417; accord, *Kellogg, supra,* 41 Cal.App.4th at pp. 1405–1407.) "The policy behind section 669 was that if the parties had done everything they could to put the case in a posture where it was ready for final rendition of judgment, a court delay should not be used to prejudice the parties. [Citations.]" (*Kellogg,* at pp. 1404–1405.) Despite Crane's argument to the contrary, *Sullivan* confirms that the court properly exercised its authority to issue a retroactive judgment here.

■ Unlike in *Williamson* and *Kellogg,* at the time of Cadlo's death, the special verdict had been filed and nothing was left to be done except to commit the verdict to a judgment signed by the court and entered. Crane, though not Metalclad, argues that the court "could not have heard and decided the posttrial motions contemplated by both sides and rendered a final judgment in the two days between the verdict and [Cadlo's] passing." This contention misses the point. Even without resolution of these posttrial motions, following the jury's verdict and before Cadlo's death the case was in a posture that a final, appealable judgment could have been entered. And an appealable judgment entered before the claimant's death protects the claimant from the strictures of section 377.34. (*Sullivan, supra,* 15 Cal.4th at pp. 304–305.) One of the posttrial motions, defendants' motion for new trial, was appealable from the judgment. (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 18 [23 Cal.Rptr.3d 490, 104 P.3d 844].) And section 664 specifically provides for entry of a judgment though a motion for judgment notwithstanding the verdict is pending, and the ruling on such a motion is separately appealable. (§ 904.1, subd. (a)(4).) Further, Maxlyn Cadlo's motion to allocate pretrial settlements pursuant to Proposition 51 was separately appealable. (See *Jones v. John Crane, Inc.* (2005) 132 Cal.App.4th 990, 997 [35 Cal.Rptr.3d 144].) Thus, under *Sullivan,* a valid, final judgment that was appealable could be entered prior to the resolution of these motions.[13]

■ Defendants argue the court abused its discretion in entering the antedated judgment for two additional reasons. First, defendants contend the record demonstrates plaintiffs were at fault for the delay in entering judgment following the verdict. A court should only enter a nunc pro tunc judgment " 'when it is apparent that the delay in rendering the judgment, or a failure to enter it after its rendition, is the result of some act or delay of the court, and is not owing to any fault of the party making the application.' " (*Williamson,*

---

[13] Crane relies on *Scalice v. Performance Cleaning Systems* (1996) 50 Cal.App.4th 221 [57 Cal.Rptr.2d 711] for its argument that the unresolved allocation of pretrial settlements prevented entry of judgment prior to Cadlo's death. In *Scalice,* a verdict was entered for Scalice on August 4, 1995, but the parties disagreed as to how to offset certain workers' compensation benefits received by Scalice. Judgment was actually entered on September 27, but "to protect [Scalice] from events beyond his control, the [trial] court entered judgment as of" September 1, the date by which the trial court believed it would have taken to resolve the deductions issue had the court not been unavailable. (*Id.* at p. 239.) On appeal, Scalice sought interest on the judgment received from the date of *verdict,* but the Court of Appeal refused to do so, apparently because of the trial court's statement that the deductions issue could not have been resolved at that time. Scalice never argued that the date of verdict was justified on the basis that the deductions decision was separately appealable and a final, appealable judgment could have been issued at the time of verdict. The *Scalice* court never considered, much less rejected that argument, which, in a different factual context, we find controlling here.

*supra*, 23 Cal.App.4th at p. 1415.) However, we cannot conclude on the record before us that the delay in rendering the judgment was attributable to plaintiffs. Plaintiffs submitted a proposed judgment to defendants approximately two days after the jury's verdict, and the trial court's determination that plaintiffs acted promptly under these circumstances was reasonable.

Second, defendants argue the court abused its discretion in concluding entry of the antedated judgment was necessary "to avoid injustice." Defendants are incorrect. Granting the motion for the antedated judgment provided Maxlyn Cadlo with a windfall in the amount of the future economic damages awarded. A contrary result would have provided defendants with a windfall for the damages for Cadlo's pain and suffering prior to his death. Since the jury had concluded that defendants were at fault for Cadlo's illness, and the trial court could reasonably believe this illness killed him soon after the verdict was entered, the court did not abuse its discretion in concluding justice was better served by granting the motion.

Thus, the trial court did not abuse its discretion in determining the judgment could be entered nunc pro tunc to March 23, 2005—the day after the jury's special verdict was filed, and the day before Cadlo's death. Guided by *Williamson*, we conclude that since a valid nunc pro tunc judgment was entered prior to Cadlo's death, section 377.34 does not limit the damages awarded in the jury verdict.

3., 4.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B. *Plaintiffs' Section 998 Offers to Metalclad and Crane Were Reasonable and Made in Good Faith**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II., III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1311.

## Disposition

The judgment is affirmed. Maxlyn Cadlo is awarded costs on appeal.

Jones, P. J., and Needham, J., concurred.

A petition for a rehearing was denied July 9, 2007, and the petition of all appellants for review by the Supreme Court was denied September 25, 2007, S154631.